Per Curiam :
This case was referred pursuant to Rule 45 to Wilson Cowen, a trial commissioner of this court, with directions to make findings of fact and his recommendation for conclusion of law. The commissioner has done so in a report filed September 4, 1962. Exceptions to the commissioner’s report were taken by the plaintiff, briefs were filed by both parties and the case was submitted to the court without argument of counsel. Since the court is in agreement with the findings and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. See Beacon Construction Company of Massachusetts v. United States, 161 Ct. Cl. 1 (1963), 314 F. 2d 501. Plaintiff is therefore not entitled to recover and its petition is dismissed.
OPINION OF COMMISSIONER
Plaintiff brought this suit to recover compensation for extra work required in the performance of a contract for the installation and construction of certain utilities at McConnell Air Force Base in Kansas.
The Department of the Air Force awarded plaintiff two contracts in connection with the construction of a military housing project at McConnell Air Force Base. The first of these was a Capehart housing contract awarded to plaintiff on April 7, 1958, pursuant to the amendment of August 11, 1955, to the National Housing Act (69 Stat. 646), known as the Capehart Housing Act. The contract, herein referred to as the housing contract, covered the construction of 490 housing units for military personnel on three separate properties or mortgage areas, which were adjacent to each other and were located on the same Government-owned *214 project site. The second contract, herein called the off-site contract, was awarded to plaintiff on August 7, 1958, and called for the construction of sewer mains, the laying of water mains, the construction of storm drains, the installation of a street lighting system, the construction of streets and other utilities. It was an appropriated funds contract; it was written on the standard Government construction form, and was complementary to the housing contract. Both contracts were under the supervision of the same contracting officer.
The contract, specifications, and drawings for the housing contract required, in addition to the construction of the housing units, the installation and construction of certain utilities to service the houses but stated that the Department would separately provide for some utilities which would be furnished by others. The contract drawings indicated that the major portion of the utilities to be constructed under the housing contract was within the boundaries of the three mortgage areas. However, four of the contract drawings contained information which, with the specifications, showed that certain utilities, including (1) sewer connections, (2) some water mains and appurtenances, (3) some gas lines and appurtenances, (4) driveway approaches and (5) public walks and street intersections were to be constructed on or across Arnold Boulevard, one of the streets serving the project and in locations which the contract drawings showed to be outside the mortgage boundary lines of the three housing areas or tracts. With the exception of the sewer connections which were deleted from the housing contract and made a part of the off-site contract by an addendum thereto, these are the items of work which are the subject matter of this action.
At the time its bid for the housing contract was submitted, plaintiff was, because of previous experience on similar projects, familiar with the regulations and procedures adopted for carrying out the provisions of the Capehart Housing Act. Plaintiff’s chief engineer, who prepared its bid for both contracts, noted when he examined the contract drawings for the housing contract that they called for the construction of certain utilities in Arnold Boulevard and out *215 side the mortgage boundary lines. However, it was his understanding that plaintiff could not be paid under the housing contract for such work, and he assumed that it would be included in the off-site contract soon to be let by the Department of the Air Force. As a result, plaintiff’s bid for the housing contract did not include any amount for the work in controversy.
Although the invitation for bids directed plaintiff to call the contracting officer’s attention to any discrepancies in the drawings and specifications, plaintiff did not call the matter to the attention of the contracting officer until after the housing contract had been awarded and until May 27, 1958, when the invitation for bids and contract drawings for the off-site contract were made available to plaintiff. Upon Observing that these drawings did not provide for the work on Arnold Boulevard, plaintiff telephoned the contracting officer, called his attention to the omission, and urged him to add these items to the off-site contract. Plaintiff’s representative stated that its bid on the housing contract did not cover such work, that plaintiff did not propose to include the work in its bid for the off-site work, and that if such construction was not made a part of the off-site contract, a dispute would arise between the parties. After the contracting officer had consulted with his architect engineer, plaintiff was informed that the work in question was required by the plans for the housing contract. Plaintiff’s bid of May 27, 1958, for the off-site contract did not include any amount for the construction of the utilities on Arnold Boulevard.
The work on the housing contract was scheduled to begin on June 16, 1958, and on June 13, 1958, about three days prior thereto, amendment No. 1 to the invitation for bids on the off-site contract was issued. By that amendment, the sewer connections, lying outside the mortgage boundary lines but previously included in the contract drawings of the housing contract, were deleted from that contract and made a part of the off-site contract. However, no change was made with respect to the four items of work in dispute. As previously stated, plaintiff was awarded the off-site contract on August 7, 1958, signed the contract on August 15, 1958, and was notified to proceed with the work on August 27, *216 1958. Before the work under the off-site contract started, plaintiff again called defendant’s attention to the fact that the utilities in issue were not covered by the plans and specifications of that contract. Nevertheless, the contracting officer required plaintiff to complete the work and it did so at a fair and reasonable cost of $11,018.15.
By letter of October 17, 1958, plaintiff requested the contracting officer to grant an addition to the off-site contract for the cost of installing the disputed utilities on Arnold Boulevard. Plaintiff’s letter called attention to the fact that its bid on the housing contract did not include the cost of the work because of plaintiff’s understanding that work performed outside the mortgage boundary lines could not be paid for or included in that contract and reiterated plaintiff’s assumption that such work would be included in the off-site contract. Plaintiff’s letter further stated:
*****
Upon receipt of the plans for the offsite contract, we discovered that these items were not indicated. At that time, we advised Capt. Kelly, who was then the Contracting Officer, of this condition and an addendum was issued requiring the installation of the sewer crossings and to omit the cost of all of the attached items. Had we included the cost of such items, we would have been at a disadvantage with our competition and would not have been the successful bidder. Our competition could not have included these items because they had no plans indicating that they were required.
In a decision of March 6, 1959, plaintiff’s claim for the extra was denied by the contracting officer on the ground that the disputed work was required to be performed by the plans and specifications of the housing contract. When plaintiff submitted a request for reconsideration, the contracting officer submitted the question to the Federal Housing Administration (hereinafter FHA) Director of Kansas for determination, although the off-site contract contained no provision authorizing an FHA official to decide disputed questions of fact arising under that contract. In his decision of July 9,1959, that official found that the contracting officer had correctly denied plaintiff’s claim. He held that it was the intent of the contract drawings of the housing *217 contract to include the work in question, although it was performed outside the mortgage boundary limits. On July 17, 1959, the contracting officer denied plaintiff’s claim for reconsideration by a decision which attached a copy of the determination made by the FHA Director and stated that if the plaintiff appealed, the contracting officer would recommend that the amount of the claim be deducted from the amount due plaintiff on the housing contract.
Within the time required by the disputes clause of the off-site contract, plaintiff appealed to the Armed Services Board of Contract Appeals which, in its decision of August 19,1960, dismissed plaintiff’s appeal on the ground that the Board had no authority to review the decision of an FHA official.
As its principal basis for recovery herein, plaintiff contends that the Capehart Housing Act and the FHA regulations promulgated pursuant thereto prohibit the expenditure of any insured mortgage funds for work performed outside the boundaries of the mortgage areas or tracts. Plaintiff then argues that the housing contract was illegal to the extent that it included the disputed work, that the law required the performance of the work under the off-site appropriated funds contract and, therefore, that plaintiff is entitled to be compensated under that contract. However, plaintiff has not cited any provision of the statute in support of its position, nor has either party pointed to any legislative history to assist the court in the interpretation of a statute which, with respect to the issue to be decided, is unclear.
The purpose of the Capehart Act is to provide adequate and inexpensive housing for members of the Armed Services and their families near the military installations to which they are attached. Under the statutory scheme and the procedures that have been developed for carrying it into effect, the major portion of the costs of such military housing projects is provided by private mortgage money, with the FHA insuring the mortgage 100 percent. When the project is completed, the military department concerned assumes complete control of the project and is responsible for amortizing the mortgage debt by the use of annual military ap *218 propriations for quarters allowances of service personnel.
The Capehart Act is found in Title IV of the Housing Amendments of 1955, 69 Stat. 646. Section 401, which revised Sections 801-808 of Title VIII of the National Housing Act, contained the FHA mortgage insurance provisions and provided in substance that the amount of any-insured mortgage could not exceed the lesser of (a) the FHA estimate of the replacement cost of the project, (b) an average of $13,500 per family unit, or (c) the lowest acceptable bid submitted by an eligible builder. With respect to the allowable limits of the insured mortgage, revised Section 803(b) (3) A stated that the FHA replacement cost of the property or project may include the cost of land, the physical improvements, and the utilities within the boundaries of the property or project; Section 803(b) (3)B, which specified that the mortgage could not exceed an average of $13,500 per family unit, contained a proviso to the effect that the estimated FHA replacement cost of the property or project, including the estimated value of any usable utilities lying within the boundaries of the property or project and not provided for out of the proceeds of the mortgage, could not exceed an average of $13,500 per family unit. In Section 505 of the Housing Act of 1956, 70 Stat. 1109, this amount was raised to $16,500.
The provisions of the Capehart Act which relate to the operation and administration of the military housing program by the Secretary of Defense or his designee are contained in Sections 403 through 409 of Title IV of the Housing Amendments of 1955 and were not made a part of revised Title VIII of the National Housing Act. Section 403, which deals with the authority of the Secretary of Defense to enter into contracts with eligible builders for the construction of the housing, provides “any such contract shall contain such terms and conditions as the Secretary may determine to be necessary to protect the interests of the United States.” Section 407 provides for the use of appropriated funds to carry out the provisions of Sections 402 through 406, and it is to be noted that there is nothing in Sections 402-407 which expressly limits the use of such ap *219 propriated funds in administering these provisions of the Act.
A study of the legislative history of the Capehart Act has not shed a great deal of light on the question involved in this suit, but the materials that have been found are contrary to plaintiff’s contentions. In the hearings on the Housing Amendments of 1955 before the Senate Subcommittee on Banking and Currency, there appear at page 186 the following statements by Senator Payne and Senator Capehart:
Senator Payne. The reason I ask is this: I think you will find — I am not positive of this, but I think you will find — that they give you the cost or the buildings themselves that are constructed. But I question whether they are bringing in the work that is done by the Corps of Engineers m constructing the sidewalks, in the landscaping, in the street-improvement work, and the other facilities, all of which are covered under Wherry and become a part of the total cost.
Senator Capehart. May I say this to the Senator: Of course, you understand on all the Wherry projects the military, depending on whether it is the Air Corps or Army or Navy, made all the specifications and awarded the contract to the contractor.
Senator Payne. That is right, but it is a lump sum.
Senator Capehart. That is right.
Senator Payne. It includes the improvements, it includes the landscaping, the street work, the sidewalks.
Senator Capehart. That is right. Under this new bill the same thing will happen. They will handle it exactly on the same basis.
As previously stated, the mortgage limitation of an average of $13,500 per family unit was increased to $16,500 by the Act of August 7, 1956, 70 Stat. 1109. During the hearings before the Committee on Banking and Currency of the House of Representatives on the Housing Act of 1956, John H. Arrington, Chief, Family Housing Division, Office of the Secretary of Defense for Properties and Installations, made the following statement at page 174:
Further, with respect to average costs per unit, the Department of Defense believes that increases such as proposed in H.R. 10157 are necessary in order to provide title VIII units which are more nearly comparable to *220 units built with appropriated funds. It is apparent that title VIII quarters under a $13,500 ceiling will not be comparable to those built with appropriated funds. The reason for this is that the title VIII limit covers all onsite expenses, such as utilities, streets, sidewalks, etc., whereas the unit cost limitations applicable to the military construction program apply only to the structure to the 5-foot line, and additional funds are used to cover site improvement costs. Eecent experience on appropriated funds construction shows that total costs have been averaging in the vicinity of $16,000 to $16,500 per unit. Moreover, there is a continued general increase in construction costs applicable to both programs.[1]
It is admittedly difficult to ascertain the intent of Congress with respect to the issue presented here, but when the provisions of the Capehart Act relating to insured mortgages (section 401) and its provisions pertaining to the administration and operation of the program (sections 403-409) are considered together and are read in connection with the legislative history here cited, it is concluded that the Congress intended to give the Secretary of Defense or his designee discretion in determining the extent to which utilities, streets, and similar improvements lying outside the boundaries of the mortgaged properties may be included in housing contracts to be financed through insured mortgages, as well as the extent to which such utilities and improvements should be constructed under contracts paid for with appropriated funds. Some flexibility was required in the proper administration of the program and Congress evidently realized this. Stated another way, it appears that the mortgage insurance provisions of the Act impose limitations on the total cost of the project and upon the average cost per family unit, but do not undertake to restrict the Secretary of Defense as to the character or location on the project of the work which he may require to be performed in contracts entered into with eligible builders.
Plaintiff also relies upon Article XII of the contract, upon FHA regulations issued for the guidance of its field person *221 nel in. tlie administration of tlie Capebart housing program, and upon an interpretation of such regulations by the FHA regional attorney for the region in which the contract was performed.
Article XII (quoted in finding 20) required plaintiff as the eligible builder to submit with each application for payment a survey showing all improvements constructed pursuant to the housing contract, together with all improvements and utilities with project boundaries. The article also specified that the survey should show the exact location of all water, sewer, gas, and electric lines and mains and stated that the surveyor should certify the extent to which the projects were installed and erected upon the land covered by the mortgages and within the building restriction lines. The final surveys furnished by plaintiff did not show any improvements or construction outside the boundaries of the mortgaged properties.
The regulations mentioned are quoted in finding 17, and the evidence shows that the FHA regional attorney interpreted such regulations to mean that FHA was prohibited from insuring an advance of the mortgage proceeds for the payment of any construction work performed beyond the boundaries of the three mortgaged properties or areas.
Although one unfamiliar with the complex instructions and procedures devised for Capehart housing contracts may not readily reach that conclusion merely by reading the regulations, it is assumed for the purposes of this case that the interpretation is correct. However, the regulations were designed for the ¡benefit of the Government and plaintiff has no standing to complain of a deviation from such regulations. If the contracting officer exceeded his authority, the Government might have repudiated his acts, but it has ratified and is relying on the housing contract. Hartford Accident and Indemnity Co. v. United States, 130 Ct. Cl. 490; National Electronic Laboratories, Inc. v. United States, 148 Ct. Cl. 308. When its bid was submitted, plaintiff was aware of the fact that the contract drawings of the housing contract required performance of the work involved here. Although plaintiff insisted that the contracting officer include the work in the off-site contract, plaintiff knew when it executed the *222 bousing contract and also when it signed the off-site contract, that the contracting officer had taken the position that the disputed work was required by the drawings and specifications of the housing contract.
For the reasons stated above, the plaintiff is not entitled to recover and its petition should be dismissed.
FINDINGS OK FACTS
1. Plaintiff is a Delaware corporation authorized to do business in Texas and Kansas.
2. Pursuant to the amendment of August 11, 1955, to the National Housing Act, 69 Stat. 635, 646, known as the Cape-hart Housing Act, the Department of the Air Force issued an invitation for bids dated March 12,1958, for the construction of 490 housing units in three separate but adjacent areas at the McConnell Air Force Base, Kansas. Plaintiff was the lowest acceptable bidder and received a letter of acceptability designating him as the eligible builder. The invitation set forth an outline of the procedures required in the construction of Capehart housing contracts under the statute referred to above. Under the terms of the invitation and letter of acceptability, plaintiff as the eligible builder was required to and did:
(a) organize three new Delaware corporations designated as the mortgagor-builders;
(¡b) arrange financing for the total cost of the project through building loan agreements between the mortgagor-builders and a private mortgagee;
(c) cause the mortgagee to obtain the Federal Housing Commissioner’s commitment for insurance of the mortgage.; and
(d) execute a three-party housing contract defining the rights and obligations of the Department of the Air Force, the eligible builder, and the mortgagor-builders.
The letter of acceptability also required the Department of the Air Force to execute a lease on the project site to the mortgagor-builders. Through this procedure and the legal instruments adopted by the Government for carrying out the provisions of the Capehart Housing Act, the privately procured FHA insured mortgage paid the entire cost of the *223 Capebart housing contract, including the construction of the housing units, the builder’s profit, all fees and charges for surveys, mortgage insurance, title searches, etc. During the progress of construction, monthly payments were made to the eligible builder by the mortgagor-builders from the funds obtained from the mortgagee in amounts which were approved by the contracting officer and the Federal Housing Commissioner, and such funds provided plaintiff’s sole source of compensation under the housing contract.
3. Following the outline of the procedures contained therein, the invitation for bids stated as follows:
The foregoing outline of procedures and relationships is intended merely for purposes of explanation. The following provisions of this Invitation, the provisions of the several instruments, and the Statute and regulations promulgated thereunder determine the rights and obligations of the parties in interest.
4. Paragraphs 4 and 9 of the invitation for bids read as follows:
4. The bidder should carefully examine the provisions of the form of Housing Contract attached hereto, including the Drawings and Specifications made a part thereof; visit the site of the housing projects; and fully inform himself as to all conditions and matters which can in any manner affect the financing of the construction and the constructing of the housing projects or their cost. Should the bidder find discrepances in, or omissions from, such Drawings and Specifications or other documents attached hereto, or should he be in doubt as to their meaning, he should at once notify the Contracting Officer, McConnell Air Force Base, Kansas, and obtain clarification prior to submitting a bid. Information given will be transmitted to all known interested bidders.
9. The Department will provide those improvements and utilities, including all off-site improvements and utilities, which are designated “to be furnished by others” on the Drawings and Specifications of the Housing Contract. The Department may in accordance with applicable laws and regulations, award the contracts for the construction of all or any portion of the improvements and utilities so designated. Payments under such separate contracts will be made by the Department from sources other than mortage proceeds.
*224 5. Plaintiff was awarded the contract and designated as the eligible builder by a letter of acceptability issued April 7, 1958. On June 2, 1958, plaintiff, the three mortgagor-builders, and defendant entered into the housing contract.
6. Under Article I of the contract, plaintiff as the “eligible builder” agreed to “furnish all labor, material, tools, plant and equipment, and perform all services and work necessary to construct the housing project in accordance with the contract documents identified in Article VI hereof* all improvements and buildings to be built and erected as shown on the Drawings and Specifications attached hereto.”
7. Article XVII of the contract read as follows:
The Department shall provide those improvements and utilities which are designated in the Drawings and Specifications to be furnished by others, and such improvements and utilities shall not be considered as work under this Housing Contract. The Contracting Officer shall not delay final inspection and recommendation to the Commissioner of acceptance of the work under this Housing Contract because of the non-completion of such improvements and utilities if the housing projects are otherwise complete. The Commissioner has agreed that he will not withhold his determination that the project or projects are complete by reason of the incomplete state of any such improvements or utilities. Nothing contained in this Article shall affect any right, remedy, duty or obligation of the Department under any other contract with any party hereto or with any other party.
8. On May 27, 1958, the Department of the Air Force also issued an invitation for bids (amending it on June 18, 1958, and June 20,1958) for the construction of off-site utilities for the 490-unit Armed Services Housing Project at McConnell Air Force Base, Kansas. The invitation had attached to it the standard form of Government construction contract and the contract itself will hereinafter be referred to as the off-site contract. On August 7,1958, plaintiff was awarded the contract for the construction of such off-site utilities and the formal contract was entered into by the parties on August 15, 1958.
*225 9. The work covered by the specifications for the off-site contract included the laying of water mains, the construction of sewer connections, and the installation of a gas line meter station and regulatory station, the construction of storm drains and drainage structures, the installation of an aerial electrical distribution and street lighting system, the excavation, construction, and paving of streets, including curbs and gutters, certain concrete work and other similar items— all outside of the mortgage boundary lines of the three housing areas covered by the housing contract.
10. Paragraph SW-02 of the housing contract provided in part as follows:
SW-02. Principal Features. A. Basic Housing Project. _ The Basic Housing Project will consist of the following items:
* # jJí
3. Street construction including all curbs and guttering and street surfacing.
4. Driveway approaches and driveways.
5. _ Installation of water distribution system and all services.
6. Installation of sanitary sewer system and all services.
7. Installation of natural gas distribution system and all services.
8. Installation of electrical distribution system and street lighting system. This includes all house services.
# * # ❖ *
The major portion of the utilities to be constructed under the housing contract was within the boundaries of the areas to be covered by the insured mortgages. However, contract drawing sheets 94, 95, 99, and 100 of the housing contract called for the installation of the following utilities on Arnold Boulevard, one of the streets running through the project:
(1) Certain water lines and appurtenances;
(2) Certain gas lines and appurtenances;
(3) Driveway approaches;
(4) Sewer connections; and
(5) Public walks at street intersections.
The contract drawings showed that this work lay outside the mortgage boundary lines of the three housing areas, but *226 the symbols on the drawings indicated that the work was to be done under the housing contract. With the exception of the sewer connections, which were added as an addendum to the off-site contract, these are the items of work which are the subject matter of this suit.
11. Plaintiff was experienced in constructing housing projects for military personnel. Prior to the issuance of the invitation for bids covering the two contracts involved here, plaintiff had constructed three housing projects under the Wherry Housing Act, 63 Stat. 570, the predecessor of the Capehart Housing Act. Plaintiff was also the successful bidder on three other Capehart Housing Projects which were constructed at about the same time as the project for the McConnell Air Force Base. When plaintiff’s chief engineer, who prepared plaintiff’s bid for both the housing and off-site contracts, examined the contract drawings, he noted that the drawings referred to in finding 10 called for the construction of certain utilities under the housing contract in areas beyond the mortgage boundary lines of the housing areas. However, it was his understanding that no eligible builder could be paid for any construction work lying outside the mortgage boundaries and that the Federal Housing Administration would not insure any advance for such construction. Therefore, he assumed that the items of work in dispute here would be covered by the off-site utilities contract soon to be let by the Department of the Air Force. The water mains and appurtenances, as well as the gas lines and appurtenances for the on-site contract, were constructed by plaintiff’s subcontractor. He was not familiar with Cape-hart Housing Projects and his bid to plaintiff included a price for the disputed water mains and gas lines on Arnold Boulevard. Since the subcontractor’s price exceeded plaintiff’s own estimate for the work, plaintiff examined the subcontractor’s detailed computations and found that his bid included the sum of $6,655 for the water and gas lines, plus the appurtenances therefor, on Arnold Boulevard. Plaintiff then informed the subcontractor that in view of plaintiff’s past experience on Capehart Housing Projects, the work lay outside the mortgage boundary lines and would be *227 included in the off-site contract. The subcontractor’s bid for the housing contract was therefore reduced by the amount stated and plaintiff’s bid did not include any amount for the disputed items of work on Arnold Boulevard.
12. Plaintiff did not question defendant’s contracting officer regarding the work referred to in finding 10 until after the housing contract had been awarded. However, on May 27, 1958, after the invitation for bids for the construction of the off-site utilities was issued, plaintiff examined the contract drawings and found that the items of work in issue here were not included in the invitation for that contract. Promptly and before its bid for the off-site work was submitted, plaintiff’s chief engineer telephoned the contracting officer, calling his attention to the fact that the items of work on Arnold Boulevard had not been included in the off-site contract, urging him to add the work to that contract, and stating that if such action was not taken a dispute between the parties would arise. The then contracting officer referred the matter to the architect engineer employed by the defendant, who informed plaintiff’s chief engineer by telephone that the work in question was required by the plans of the on-site contract.
In the conversations with defendant’s representatives, plaintiff’s engineer stated that plaintiff’s bid on the housing contract did not include any estimate for the disputed work and that plaintiff did not intend to include any estimate for such work in the off-site contract because the drawings for that contract did not call for such work to be performed. Plaintiff’s bid for the off-site contract, which was submitted about May 27,1958, did not include any amount for the construction of the items of work now in dispute.
13. On June 2, 1958, a conference for the initial closing of the housing contract was held in Washington, D.C., at which time representatives of plaintiff, the contracting officer, and other representatives of several Government agencies involved were present. The housing contract was signed at that time and various other legal documents required under the established procedure for Capehart Housing Projects were delivered. Although both parties were then aware *228 of the controversy, which is the subject of this action, the record does not show that there was any discussion or other action taken with respect to the dispute.
14. The work on the housing contract was scheduled to begin on June 16, 1958, and plaintiff received notice to proceed with the work on the off-site contract on August 27, 1958. On June 13,1958, by amendment No. 1 to the invitation for bids on the off-site contract, the sewer crossings on Arnold Boulevard which had been included as a part of the work of the housing contract as shown on the contract drawings were added to the work of the off-site contract. No changes were made with respect to the remaining items of work in controversy. However, prior to beginning construction on the off-site contract, plaintiff called defendant’s attention to the fact that the construction or installation of (a) water lines and appurtenances, (b) gas lines and appurtenances, (c) driveway approaches, and (d) public walks at street intersections, were not shown on the plans and specifications for that contract. Plaintiff was required by the contracting officer to complete these four items of work. The fair and reasonable cost of such work was $11,018.15.
15. By letter of October 17, 1958, plaintiff requested the contracting officer to grant an addition to the off-site contract for the cost of the work described in the preceding finding. Plaintiff’s letter read in part as follows:
All listed items are outside of the boundaries of the three mortgage areas and therefore were not included in our bid for the Capehart Project. It is our understanding that such items of work can not be recognized to be a part of the mortgage unless they are within the actual mortgage limits. The Capehart onsite plans show these items as being in the Arnold Boulevard Bight-of-Way and therefore we assumed that they would be included in the offsite contract which was to be advertised for bids at a later date.
Upon receipt of the plans for the offsite contract, we discovered that these items were not indicated. At that time, we advised Capt. Kelly, who was then the Contracting Officer, of this condition and an addendum was issued requiring the installation of the sewer crossings, but no mention was made of the balance of the items which we have listed. Therefore, we had no choice but to include only the cost of the sewer crossings and to *229 omit the cost of all of the attached items. Had we included the cost of such items, we would have been at a disadvantage with our competition and would not have been the successful bidder. Our competition could not have included these items because they had no plans indicating that they were required.
With the above information in support of our claim, we respectfully submit our request for an increase of $11,018.15 to our present offsite contract. We have priced these items in accord with the prices that we used in bidding the original contract.
In the interest of expediting the progress of the project, we have taken the responsibility of authorizing our subcontractors to install such items of work as are necessary, with the assumption that the Air Force will give fair and proper consideration to this request.
16. The contracting officer sought advice from the architect engineer who wrote him on January 4, 1959, that the question as to whether work outside of the mortgage boundaries of the project could be included in the mortgage proceeds was a legal one but that both the architect and the defendant’s consulting engineer felt that the work in dispute was clearly shown on the drawings for the housing contract. By decision dated March 6, 1959, the contracting officer denied plaintiff’s request of October 17, 1958, on the ground that the work in question was required to be done by the plans and specifications of the housing contract. Plaintiff requested the contracting officer to reconsider his decision and by letter of April 23,1959, the contracting officer referred the dispute to the Director of the Federal Housing Administration for Kansas for review and determination. In a letter of July 9, 1959, to the contracting officer, the Federal Housing Administration District Director found that the contracting officer was justified in denying plaintiff’s claim in this action. His decision was based on his finding that it was the intent of the contract drawings for the housing contract to include the work in question although the work was performed outside the mortgage boundary limits.
17. At the time the foregoing decision was made, a manual issued by the FHA for the guidance of its personnel, *230 contained the following regulations applicable to Capehart Housing Projects:
72732. The cost for new on-site utilities or construction provided by utility companies or governmental agencies will be included in the estimated cost of on-site improvements to be provided under the Housing Contract only to the extent of the cost to the builder.
72732.1 The Military or the United States Government may have certain utilities or other improvements involving labor and/or material (exclusive of site preparation) installed or agree to have installed, on sites owned by the government, by means other than the Housing Contract. Such work will be designated as “usable utilities.” A separate estimate will be prepared. This estimate will include all on-site utilities, construction or equipment essential to a complete project, including those items not considered or classified as utilities, such as ranges and refrigerators, which have been or will be provided by the Military or the government, and are not included in the Housing Contract. (This separate estimate of “usable utilities” is used by the Mortgage Credit Section to reduce the statutory per unit dollar limitation.) Site preparation provided by the government or Military outside of the Housing Contract, such as demolition of existing structures, land filling, site drainage, grubbing, rough grading and other such work required to produce an adequate and usable site, are not included as “usable utilities.” The “value” of “usable utilities” referred to in Section 803 of the Act is considered to be the estimated cost of “usable utilities.” _
_ 72732.2 In estimating the costs for “usable utilities” only the cost for that portion adequate to serve the needs of the project will be included. Any excess in size, length, or capacity will be ignored. Only the portion that is usable will be included and then only in the substitute size, length, capacity and material necessary to serve the project. For example a water main running through a site will be included up to the tap or take-off at the cost of a size essential to serve the project. Where multiple taps or connections are used the cost of a main of the size required will be included up to the last connection. In either case the portion beyond the last connection provided for use by others outside the project will not be included. The estimate of “usable utilities” will include the items of job overhead and builder’s fee. The sum of the estimated costs for “usable utilities” and the portion to be provided under the contract for the *231 project should not exceed the cost for a similar utility or system designed solely for the project.
As construed by the regional attorney of the FHA for the region including Kansas, these regulations precluded FHA from insuring any advance for the payment of any construction work performed outside the boundaries of the three mortgage areas.
18. The “Disputes” article of the housing contract, section 8 of the general provisions thereof, provided in pertinent part as follows:
Except as otherwise provided in this Housing Contract, any dispute concerning a question of fact arising under this Housing Contract which is not finally decided by the Commissioner, which may be adjusted between the eligible builder and the Contracting Officer and which is not in fact disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the eligible builder. Within 30 days from the date of receipt of such copy? the eligible builder may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the Department, * * *.
However, the “Disputes” clause of the off-site contract, section 6 of the general provisions of that contract, contained no provision for a decision by the Federal Housing Commissioner on any question of fact arising under the contract.
19. On July 17, 1959, the contracting officer again denied plaintiff’s claim for an addition under the off-site contract. His decision read in part as follows:
2. The undersigned contracting officer has decided that your request, as set forth above, is disallowed in whole for the following reasons:
a. Decision of the commissioner, attached.
b. The facts, as clearly pointed out in attached letters from the Architect Engineer and his consulting engineer, in the Onsite plans and specifications and admitted by you in your letter, 17 October 1958, Request for Addition to Offsite Contract for Capehart Housing Project, McConnell Air Force Base, Kansas, Contract No. AF 14(614)-435, are:
*232 (1) The work in. question was shown in the Onsite plans and specifications for the reasons as pointed out in subparagraph 2 of paragraph 4 of letter from the Architect Engineer, 14 January 1959.
(2) This office was not queried in regard to a possible mistake in plans and specifications at any time prior to the Onsite bid opening by any of the bidders.
3. Based on the facts listed, the only conclusion that can be drawn is that your Onsite bid was based on the Onsite work shown in the Onsite plans and specifications.
4. If an appeal is deemed necessary, based upon the assumption in paragraph 2 of your letter, this office will recommend a deduction in the amount of your claim from the Onsite contract.
20. Article XII of the contract provided:
The eligible builder shall furnish to the Contracting Officer, the mortgagees and the Commissioner a survey showing the location on the site of all improvements constructed pursuant to this Housing Contract, together with all improvements and utilities within the project boundaries. Such survey shall be supplied with each application of the eligible builder for payment. The survey accompanying the request for final payment must show the exact location of all water, sewer, gas, and electric lines and mains. Such surveys shall be prepared by a licensed surveyor who shall certify the extent to which the projects are installed and erected upon the land covered by the mortgages and within the building restriction lines, if any, on said land, and the extent, if any, to which any part thereof overhangs or encroaches upon any land, easement, or right-of-way of others.
The final surveys submitted by plaintiff upon the completion of the housing contract did not show any improvements or construction outside the boundaries of the mortgaged properties. When the construction of each of the three housing areas was completed, there was a final closing under the control of FHA. At that time, the contracting officer certified completion of the housing project to the FHA Commissioner, who then endorsed the note of the mortgagee-builder for FHA insurance. Under the established procedure for Capehart Housing Projects, the amount of the insured mortgage and the contract price paid to the eligible builder are always the same.
*233 21. Within the time specified in the off-site contract, plaintiff duly appealed the contracting officer’s adverse decision of July 17, 1959, to the Armed Services Board of Contract Appeals. The Board denied plaintiff’s appeal in a decision of August 19, 1960, on the ground that the Board had no authority to review a decision of an FHA official.
CONCLUSION OF LAW
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed.

 A similar statement was made by Roger W. Pulling, Acting Assistant Secretary of Defense, in the hearings on the 1956 Housing Amendments before a Subcommittee of the Senate Committee on Banting and Currency, page 200. See also memorandum from Harlow W. Harvey, Jr., Department of Defense, 1957 U.S. Code Congressional and Administrative News, page 1345.