Kunzig, Judge,
dissenting:
With all respect for the sentiments of my colleagues, I cannot join in their conclusion. The majority’s decision disturbs me because it transforms a case which, if correctly decided, would be settled on elementary legal principles, into a case which must now undergo an aggravatingly complex and costly trial. On the unexplained conclusion that an "ambiguity” exists in the contract, the majority disregards the contract’s plain meaning and launches into questions of extrinsic evidence totally unnecessary to reach. The majority has succumbed to plaintiffs obfuscating tactic of raising a host of factual issues irrelevant to the fundamental legal questions involved.
The crux of the case, which the majority fails directly to address, is this: estimates of timber quantities on the Goolaway sale were included in section A2 of plaintiffs contract. No representation whatsover of a defect rate appeared in the contract, but the prospectus estimates did include a defect rate of 20.3%. Plaintiff now claims it will experience a defect rate of 51.13% on the contract and is incurring increased operational costs as a result. Plaintiff argues the Government somehow warranted that the defect rate would not be much more than 20.3% and that it should be responsible for the costs of the higher defect rate. Plaintiff does not, nor can it contend, it is being forced to pay for bad timber as a consequence of the higher defect rate because under the contract terms, plaintiff only pays according to thousand board feet of merchantable timber removed from the contract designated areas rather than a lump sum price for all designated timber, whatever its value or grade. Confining ourselves for the moment strictly to the terms of the contract, what does it say regarding the Government’s responsibility for the accuracy of the estimate included in section A2?
It states, rather clearly to me, in section B2.4:
However, the estimated volumes stated in A2 are not to be construed as guarantees or limitations of the timber *749 volumes to be designated for cutting under the terms of this contract.
In the face of this disclaimer plaintiff argues it does not mean what it says. Plaintiff argues B2.4 was at most a partial disclaimer or that the parties contracted on the basis of mutual mistake. Finding this interpretation "plausible”, the majority concludes an ambiguity in the contract exists calling for the introduction of extrinsic evidence. Of course, extrinsic evidence is admitted only when an ambiguity can be found; if there is no ambiguity, extrinsic evidence is to be excluded in favor of the contract’s language. Here, there is no ambiguity, no need for extrinsic evidence, nor is plaintiffs interpretation in any way plausible. Plaintiffs argument that perhaps only a limited disclaimer was intended is contrary to a line of timber estimate cases in this court holding generally that where the Government fails to disclaim the accuracy of its estimates it may be held liable, Everett Plywood & Door Corp. v. United States, 190 Ct. Cl. 80, 419 F.2d 425 (1969), but when a disclaimer is given, no liability will attach. Russell & Pugh Lumber Co. v. United States, 154 Ct. Cl. 122, 290 F.2d 938 (1961). See also Brawley v. United States, 96 U.S. 168 (1877). The majority cites no authority for its novel "half disclaimer” interpretation other than Timber Investors, Inc. v. United States, 218 Ct. Cl. 408, 587 F.2d 472 (1978) which propounds no new rule of law and is readily distinguishable in any event, as I will explain below. The practical unworkability of such an interpretation of the disclaimer is further demonstrated when we consider how damages can be assessed. Under the majority approach, the court will have to arrived at a defect estimate rate which is only "reasonably erroneous”, a strange exercise to say the least.
Rather than attempting to construe the contract provisions as a coherent whole, Hol-Gar Manufacturing Co. v. United States, 169 Ct.Cl. 384, 351 F.2d 972 (1965), as is our obligation, the majority strains to find an "ambiguity.” Let us, however, assume the contract is ambiguous and proceed to examine specific extrinsic evidence. By far the most compelling evidence is the prospectus, recognized by both *750 parties and addressed directly to the point in question. What does the prospectus say? With blazing red lights and blaring sirens the words of the prospectus in effect warn: Bidder, these estimates are no guarantee of timber quantity or quality. Do your own investigation and estimation. What need is there to resort to further extrinsic evidence, such as industry practice, in the face of unequivocal language? Carrying the argument further, even if we do look to industry practice we see the variation from estimates of timber defect rates is historically very high, recent figures showing variations of anywhere between 35% and 200%. Williamette Industries, Inc., Comp. Gen. Dec. B-188548, November 8, 1979. In this case the margin of error is roughly 30% thus far.
The straightforward and well settled principles described above, I contend, readily dispose of this case. Instead, the majority is swayed by a miscellany of minor factors none of which individually is sufficient to give plaintiff the decision, but apparently (the majority believes) are convincing when added together. In my opinion, a collection of weak arguments never amounts to a single strong one and the links used to forge the majority’s chain are weak indeed. To illustrate:
Great emphasis is placed on a Forest Service Manual provision, § 2431.23, cautioning Forest Service estimators to prepare estimates carefully. This is merely an admonition directed exclusively to Forest Service personnel and is wholly insufficient to serve as a basis for granting plaintiff substantive contract rights when it is beyond cavil the reason estimates are made at all is for the Government’s benefit — to ensure it may obtain a fair price for the timber it sells and comply with the Forest Service’s statutory duty not to sell timber for less than its appraised value. 16 U.S.C. § 472(a) (1976). Procedures followed and duties performed solely for benefit of the Government, as a general rule, cannot be asserted and relied upon by plaintiff. United States v. Neustadt, 366 U.S. 696, 708-10 (1961). See Centex Construction Co. v. United States, 162 Ct. Cl. 211 (1963); Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 599-60 (1980). Lastly, as to this point, Melvin McGrew, the individual completely responsible for bidding on the *751 Goolaway sale on behalf of plaintiff, has already testified that he did not rely on, and in fact has never read the Forest Service Manual.
Moving on, the majority agonizes over why the estimates were placed in the contract at all and fears giving effect to the disclaimer renders the estimates a "nullity” it wishes to avoid. The argument is unfounded for several reasons. Looked at sensibly, the estimates were placed in the contract for what they were worth and disclaimed. As defendant notes, failure to place the estimates in the contract could leave defendant vulnerable to an accusation of undisclosed superior knowledge. Existence of a valid reason for inclusion of the estimate, with disclaimer, eliminates the majority’s "nullity” concern. Giving effect to the disclaimer in section B2.4 in no way renders the estimates null — the estimates stand as a representation of the Government to the contractor that these were the figures it used in arriving at its calculation of the timber’s worth. The estimate is by no means null for the contractor was free to imbue it with as much validity as it wished, but was not to regard it as any guarantee of actual conditions. Furthermore, adopting the majority’s position does far greater violence to the contract’s explicit terms, by in effect, striking the disclaimer. Acknowledging the disclaimer nullifies nothing, but ignoring it, as does the majority, excises it from the contract entirely.
The principles of Timber Investors, do not pertain to this case. The statement allowing the possibility of government liability for grossly erroneous estimates was dicta and limited to the "unique” circumstances of the case. Those circumstances included a situation where the plaintiff was essentially forced to accept, without the chance to verify itself, government estimates of road construction credits. Here plaintiff had ample opportunity and the means to verify the government’s estimate and was encouraged to do so. Also, Timber Investors discussed liability in terms of mutual mistake; yet that theory is inapplicable here since both parties must be deemed to have understood the "no guarantee” nature of the government’s estimates. Additionally, the historically extreme variance between defect *752 estimates and actual circumstances indicates the parties’ awareness of the unreliability of such estimates.
The specific facts of this case and language of the contract at issue allow no other conclusion than that the government effectively disclaimed accuracy of the estimated defect rate. This conclusion is consonant with federal policy generally in timber sales as described by Oregon’s Senator Wayne Morse, 105 Cong. Rec. 13870 (1959):
The sale of timber by the government is on a caveat emptor basis. It would be prejudicial to the government’s interest to guarantee these estimates.
I might have more sympathy for plaintiff if it was an innocent novice in this field, but plaintiff has been in the logging business for approximately 30 years. Melvin McGrew himself has approximately 50 years experience in evaluating the value of timber. The organization needs no help from this court.
In conclusion, perhaps the most troubling aspect of the majority’s decision is that it provides a springboard for attack against disclaimer provisions in any government contract. In the future I fear the court will be compelled to struggle around this decision creating questionable distinctions, thereby engendering further uncertainty in the law. "I think that the order of the court in this case proposes a course of conduct that will be an expensive exercise in futility”[1] not only in the instant case, but in many cases in the years that lie ahead.
I therefore dissent.
Defendant’s motion for rehearing en banc was denied October 2, 1980. On January 30, 1981 the petition was dismissed on plaintiffs motion.

 Prairie v. United States, ante at 735.