## UNITED STATES *v.* NEUSTADT ET UX.

No. 533. Argued May 2, 1961.—
Decided May 29, 1961.

*Assistant Attorney General Orrick* argued the cause for the United States. With him on the briefs were *Solicitor General Cox,* former *Solicitor General Rankin, Assistant Attorney General Doub, Morton Hollander, John G. Laughlin, Jr.* and *Sherman L. Cohn.*

*Lawrence J. Latto* argued the cause and filed a brief for respondents.

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

Pursuant to the provisions of the National Housing Act of 1934,[1] as amended, the Federal Housing Administration (FHA) is authorized, in certain instances, to insure the partial repayment of loans secured by mortgages executed

---

[1] 48 Stat. 1246, 12 U. S. C. §§ 1701 *et seq.*

to finance the purchase of private residential properties.[2] When duly requested to do so by a qualified lender, the FHA, through its appraisal staff, makes an inspection of property offered for sale in order to determine whether the property is eligible for FHA mortgage insurance, and to assign an appraised value establishing the maximum amount of mortgage insurance obtainable.[3]

The question for decision in this case is whether the United States may be held liable, under the Federal Tort Claims Act, 28 U. S. C. § 1346 (b),[4] to a purchaser of residential property who has been furnished a statement reporting the results of an inaccurate FHA inspection and appraisal, and who, in reliance thereon, has been induced by the seller to pay a purchase price in excess

[2] Section 203 of the National Housing Act of 1934, as amended, 12 U. S. C. § 1709, provided at the times here pertinent that:

"(a) . . . The [Federal Housing] Commissioner is authorized, upon application by the mortgagee, to insure as hereinafter provided any mortgage offered to him which is eligible for insurance as hereinafter provided, and, upon such terms as the Commissioner may prescribe, to make commitments for the insuring of such mortgages prior to the date of their execution or disbursement thereon . . . .

"(b) . . . To be eligible for insurance under this section a mortgage shall—

"(2) Involve a principal obligation . . . not to exceed an amount equal to the sum of (i) 95 per centum . . . of $9,000. of the [FHA] appraised value (as of the date the mortgage is accepted for insurance), and (ii) 75 per centum of such value in excess of $9,000 . . . ."

[3] 24 CFR §§ 200.145, 200.146, 200.148 (1959 ed.).

[4] "[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

of the property's fair market value. The answer turns upon the correct interpretation of 28 U. S. C. § 2680 (h), which precludes recovery under the Tort Claims Act upon "[a]ny claim arising out of . . . misrepresentation." The material facts giving rise to the controversy are not in dispute, and may be summarized as follows.

Early in 1957, the property in question, consisting of a 16-year-old single-family brick house and lot located in Alexandria, Virginia, was offered for sale by its owners. To assure that FHA mortgage insurance would be available to secure a loan in the event that the purchaser, when ascertained, might desire to finance the purchase by that method, the owners requested a qualified lending institution to take the necessary steps to have the property inspected and appraised by the FHA; and pursuant to the lending agent's application,[5] an FHA appraiser visited and inspected the premises. On the basis of that inspection, which disclosed no defects that would disqualify the property for mortgage insurance, the FHA issued to the lending agency a "conditional commitment," [6] stating that the property had been approved for mortgage insurance and, for that purpose, had been assigned an appraised value of $22,750. Under § 203 (b)(2) of the National Housing Act,[7] the maximum amount of

---

[5] An application for FHA mortgage insurance may be made only by a financial institution approved as a mortgagee by the FHA. § 203 (a), National Housing Act, supra, 12 U. S. C. § 1709 (a). Applications may be, and commonly are, made in advance of actual sale and execution of the mortgage, 24 CFR § 221.9 (1959 ed.), in order that the seller may have the property inspected, approved, and appraised for mortgage insurance while the purchaser is still unknown.

[6] The commitment to insure a mortgage is conditioned upon the mortgagor's being found financially able to carry the mortgage. 24 CFR §§ 200.147, 200.148 (1) (1959 ed.).

[7] Note 2, supra.

mortgage insurance obtainable on an appraised value of $22,750 was $18,800.[8]

Shortly thereafter, the respondents, Mr. and Mrs. Stanley S. Neustadt, examined the property and became interested in buying it. After negotiations extending over the period of a month, in the course of which respondents were advised by the sellers that the property had been appraised by the FHA at a value of $22,750 for mortgage insurance purposes, respondents entered into a conditional contract to purchase the property at a price of $24,000. The contract was conditioned upon the respondents' obtaining a loan secured by an FHA-insured mortgage in the amount of $18,800. In accordance with § 226 of the National Housing Act,[9] the contract also provided that the sellers would deliver to respondents, prior to the sale of the property, a written statement setting forth the FHA-appraised value. Both conditions were fulfilled, and on the settlement date, July 2, 1957, respondents took title to the property, and acknowledged by their signatures that they had been furnished with a written "Statement of FHA Appraisal." This was an official FHA document, stating that the FHA "has appraised the property identified . . . and

---

[8] Under § 203 (b) (2), the maximum insurable amount was $18,862.50 (95% of $9,000, plus 75% of $13,750). By FHA regulations, mortgages were insurable only in multiples of $100. 24 CFR § 221.17 (a) (1958 Supp.).

[9] Section 226 was enacted in 1954 (68 Stat. 607, 12 U. S. C. § 1715q) and provides in pertinent part as follows:

"The Commissioner is hereby authorized and directed to require that, in connection with any property . . . approved for mortgage insurance . . . the seller or builder . . . shall agree to deliver, prior to the sale of the property, to the person purchasing such dwelling for his own occupancy, a written statement setting forth the amount of the appraised value of the property as determined by the Commissioner. . . ."

for mortgage insurance purposes has placed an FHA-appraised value of $22,750 on such property as of the date of this statement. (*The FHA appraised value does not establish sales price.*)" (Emphasis in original.)

Respondents moved into the house on July 10, 1957. According to their testimony, they had previously inspected the house "quite carefully," and had found "absolutely nothing which would indicate the necessity for any redecoration at all." The house was "immaculately clean" and the walls and ceilings "looked fine." However, within a month after respondents moved in, substantial cracks developed in the ceilings and in the interior and exterior walls throughout the house. When building repair contractors were unable to ascertain the cause of the cracks, the original builder of the house and four FHA field inspectors were summoned, and a thorough investigation was made by them. By drilling a hole through the concrete floor of the basement, it was discovered that the subsoil was composed of a type of clay which becomes pliable when moist. Due to poor drainage conditions on the surface, water had seeped into the clay, causing it to shift beneath the foundations of the house and to produce the cracks which had appeared in the walls and ceilings.

Ten months thereafter, respondents commenced this action against the Government, under the Federal Tort Claims Act, in the United States District Court for the Eastern District of Virginia, seeking recovery of the difference between the fair market value of the property and the purchase price of $24,000. The complaint alleged that the FHA's inspection and appraisal of the property for mortgage insurance purposes had been conducted negligently; that respondents were justified in relying upon the results of that inspection and appraisal; and that they "would not have purchased the property for

$24,000 but for the carelessness and negligence of [FHA]."

After trial, the District Court found [10] that respondents "in good faith relied upon the [FHA's] appraisal in consummating their contract of purchase," and that "reasonable care by a qualified appraiser would have warned" respondents of the "serious structural defects" in the house which had been "preponderantly proved." On that basis, the court adjudged the Government liable in the amount of $8,000, which it found to be the difference between the property's fair market value at the time of sale ($16,000) and the purchase price ($24,000).

On appeal, the judgment was affirmed by the Court of Appeals for the Fourth Circuit, 281 F. 2d 596, over the Government's sedulous objection that recovery was barred by 28 U. S. C. § 2680 (h), which excepts from the coverage of the Tort Claims Act "[a]ny claim arising out of . . . misrepresentation." Because of the importance of the question, and to resolve an apparent conflict between the Fourth Circuit's decision and the holdings of other Circuits uniformly construing the "misrepresentation" exception of § 2680 (h) to preclude recovery on closely analogous facts,[11] we granted certiorari. 364 U. S. 926. We have concluded that the interpretation adopted by the Fourth Circuit is erroneous, and that the Government must be absolved from liability.

In its complete form, § 2680 (h) excludes recovery under the Federal Tort Claims Act upon "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, *misrepresentation, deceit,* or interference with contract rights." (Emphasis added.) The Government's

---

[10] There is no right to a jury trial under the Tort Claims Act. 28 U. S. C. § 2402.

[11] The cases are cited and discussed at pp. 702–705, *infra.*

position is that, since Congress employed both the terms "misrepresentation" and "deceit" in § 2680 (h), it clearly meant to exclude claims arising out of negligent, as well as deliberate, misrepresentation; and therefore, even assuming that the District Court correctly found that the inaccurate FHA appraisal in this case resulted from a negligent inspection, and that respondents relied upon that appraisal to their detriment,[12] the claim must nevertheless fail as one "arising out of . . . [negligent] misrepresentation."

We are in accord with the view urged by the Government, and unanimously adopted by all Circuits which have previously had occasion to pass on the question, that § 2680 (h) comprehends claims arising out of negligent, as well as willful, misrepresentation.

The leading precedent has been the Second Circuit's decision in *Jones* v. *United States,* 207 F. 2d 563, which involved a statement issued to the plaintiffs by the United States Geological Survey erroneously estimating the oil-producing capacity of certain land. In reliance upon that statement, plaintiffs sold securities representing oil and gas rights in the land for less than their actual value, and later sought to recoup their loss from the Government under the Tort Claims Act on a complaint alleging negligent misrepresentation. Affirming a dismissal of the complaint, the Second Circuit tersely pointed out that § 2680 (h) applies to both "misrepresentation" and "deceit," and, "[a]s 'deceit' means fraudulent misrepresentation, 'misrepresentation' must have been meant to include negligent misrepresentation, since otherwise the word 'misrepresentation' would be duplicative." 207 F. 2d, at 564. Following this interpretation, in an unbroken line, are the cases of *National Mfg. Co.* v. *United States,*

---

[12] Neither in the Court of Appeals, nor in this Court, has the Government chosen to contest these findings.

210 F. 2d 263 (C. A. 8th Cir.); *Clark* v. *United States,* 218 F. 2d 446 (C. A. 9th Cir.); *Miller Harness Co.* v. *United States,* 241 F. 2d 781 (C. A. 2d Cir.); *Anglo-American Corp.* v. *United States,* 242 F. 2d 236 (C. A. 2d Cir.); *Hall* v. *United States,* 274 F. 2d 69 (C. A. 10th Cir.). In accord also are *Social Security Adm'n* v. *United States,* 138 F. Supp. 639 (D. C. D. Md.), and *United States* v. *Van Meter,* 149 F. Supp. 493 (D. C. N. D. Cal.).

Throughout this line of decisions, the argument has been made by plaintiffs, and consistently rejected by the courts, until this case, that the bar of § 2680 (h) does not apply when the gist of the claim lies in *negligence* underlying the inaccurate representation, *i. e.,* when the claim is phrased as one "arising out of" negligence rather than "misrepresentation." But this argument, as was forcefully demonstrated by the Tenth Circuit in *Hall* v. *United States, supra,* is nothing more than an attempt to circumvent § 2680 (h) by denying that it applies to negligent misrepresentation. In the *Hall* case, it was alleged that agents of the Department of Agriculture had negligently inspected the plaintiff's cattle and, as a result, mistakenly reported that the cattle were diseased. Relying upon that report, plaintiff sold the cattle at less than their fair value, and sought recovery from the Government of his loss on the ground that it had been caused by the negligent inspection underlying the agents' report, rather than by the report itself. The Tenth Circuit rejected the claim, stating:

"We must then look beyond the literal meaning of the language to ascertain the real cause of complaint. . . . Plaintiff's loss came about when the Government agents misrepresented the condition of the cattle, telling him they were diseased when, in fact, they were free from disease. . . . This stated a cause of action predicated on a misrepresentation.

Misrepresentation as used in the exclusionary provision [of § 2680 (h)] was meant to include negligent misrepresentation." 274 F. 2d, at 71.[13]

In the instant case, the Fourth Circuit took the opposite view, and held that respondents could recover on the sole basis of the underlying negligence. Although it agreed that § 2680 (h) embraces both "negligent" and "willful" misrepresentation, and that respondents' claim "might form the basis of an action for misrepresentation under general common-law principles," 281 F. 2d, at 601, it deemed § 2680 (h) inapplicable here for the reason that the misrepresentation was "merely incidental" to the "gravamen" of the claim, i. e., "the careless making of an excessive appraisal so that [respondents were] . . . deceived and suffered substantial loss." Id., at 602.

---

[13] In *Anglo-American & Overseas Corp.* v. *United States*, 242 F. 2d 236, the Second Circuit analyzed a similar claim and exposed its true basis: "[Plaintiff] contracted to sell tomato paste to the United States, which required as a condition precedent to its acceptance of the paste that it satisfy the standards of the Food and Drug Administration. The paste was imported; and the Food and Drug Administration, after sampling it, issued 'release notices' that notified Customs officers that the tomato paste could enter the country. [Plaintiff] then accepted delivery. When it in turn delivered the paste to the government, federal officials once again inspected the paste, found that it did not satisfy the standards of the Food and Drug Administration, and ordered it destroyed. [Plaintiff] sues now on the ground that the negligence of officials of the Food and Drug Administration in sampling the tomato paste and in issuing the 'release notices' induced it to accept the paste and thus suffer damages.

"This claim, it is clear, 'arose out of' the assertedly negligent representation of the quality of the tomato paste by federal employees. Such a claim is barred by . . . Section 2680 (h) . . . [which excepts] from liability negligent as well as intentional misrepresentation." *Id.*, at 237.

Since § 226 of the National Housing Act [14] requires that a seller of property approved for FHA mortgage insurance "shall agree to deliver, prior to the sale of the property, to the person purchasing such [property], a written statement setting forth the amount of the [FHA] appraised value . . . ," the Fourth Circuit reasoned that the FHA appraisal procedure was designed to protect prospective home purchasers; that the Government (through the FHA) therefore "owed a specific duty" to respondents to make a careful appraisal; and that "if the government assumes a duty and negligently performs it, a party injured thereby may recover damages from the United States even though the careless performance of the duty may have been accompanied by some misrepresentation of fact." *Id.*, at 599.

Whether or not this analysis accords with the law of States which have seen fit to allow recovery under analogous circumstances,[15] it does not meet the question of

---

[14] Note 9, *supra*.

[15] The Fourth Circuit sought primary support from the New York Court of Appeals' decision in *Glanzer* v. *Shepard*, 233 N. Y. 236, 135 N. E. 275, in which the defendants, who were public weighers, were requested by a vendor to weigh certain goods and to issue a certificate of weight to the buyer. The goods were weighed inaccurately, and on the strength of the erroneous weight certificate, the buyer paid an excessive purchase price. In allowing the buyer to recover from defendants, the New York court looked primarily to the negligence in performing the act of weighing, and stated that defendants were liable both for their "careless words" and their "careless performance of a service." The case has been widely discussed by tort authorities as epitomizing "negligent misrepresentation." See, *e. g.*, 1 Harper and James, Torts, 546–548 (1956); Prosser, Torts, 734, 737 (1941 ed.); Bohlen, Should Negligent Misrepresentations Be Treated as Negligence or Fraud? 18 Va. L. Rev. 703, 708 (1932). *Glanzer* has been followed in a number of States which have broken from the earlier, virtually unanimous, American

whether this claim is outside the intended scope of the Federal Tort Claims Act, which depends solely upon what Congress meant by the language it used in § 2680 (h).

To say, as the Fourth Circuit did, that a claim arises out of "negligence," rather than "misrepresentation," when the loss suffered by the injured party is caused by the breach of a "specific duty" owed by the Government to him, *i. e.*, the duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood legal definition of the tort of "negligent misrepresentation," as is clearly, if not conclusively, shown by the authorities set forth in the margin,[16] and

---

view subscribing to the English case of *Derry* v. *Peek*, L. R. 14 App. Cas. 337, 58 L. J. Rep. Ch. 864 (1889) (refusing to allow recovery for negligent misrepresentation). See cases cited in 1 Harper and James, Torts, 546, n. 5 (1956). Cf. *Ultramares Corp.* v. *Touche*, 255 N. Y. 170, 174 N. E. 441.

Under the Federal Tort Claims Act, when a claim is not barred by one of the Act's exclusionary provisions, the liability of the Government must be determined "in accordance with the law of the place where the act or omission occurred." 28 U. S. C. § 1346 (b). The Fourth Circuit's opinion, although it concluded that § 2680 (h) did not bar respondents' claim, did not indicate whether Virginia law follows the New York rule of *Glanzer* v. *Shepard, supra.* In view of our conclusion that § 2680 (h) applies, we need not explore this question.

[16] The American Law Institute's Restatement of Torts (1938), c. 22, "DECEIT: BUSINESS TRANSACTIONS," Topic 3, "Negligent Misrepresentations," states as follows:

"§ 552. Information Negligently Supplied for the Guidance of Others.

"One who in the course of his business or profession supplies information for the guidance of others in their business transactions is

which there is every reason to believe Congress had in mind when it placed the word "misrepresentation" before the word "deceit" in § 2680 (h). As the Second Circuit observed in *Jones* v. *United States, supra,* "deceit" alone would have been sufficient had Congress intended only to except deliberately false representations.[17] Certainly there is no warrant for assuming that Congress was unaware of established tort definitions when it enacted the Tort Claims Act in 1946, after spending "some twenty-eight years of congressional drafting and redrafting, amendment and counter-amendment." *United States*

---

subject to liability for harm caused to them by their reliance upon the information if

"(a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and

"(b) the harm is suffered

"(i) by the person or one of the class of persons for whose guidance the information was supplied, and

"(ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith."

Prosser, Torts (1941 ed.), c. 16, "Misrepresentation," § 87, "Basis of Responsibility," states:

"Responsibility for misrepresentation may be divided into the usual tort classifications. It may rest upon:

"a. An intent to deceive, consisting of belief that the representation is false . . . . [S]uch an intent is required for the action of deceit.

"b. Negligence in obtaining information or in making the representation. . . .

"c. A policy holding the maker strictly responsible for the truth of the representation . . . ."

See also Bohlen, Misrepresentation as Deceit, Negligence, or Warranty, 42 Harv. L. Rev. 733, 735–739 (1929); 23 Am. Jur., Fraud and Deceit, § 126, "Negligent Representations" (1939).

[17] See 2 Harper and James, Torts, § 29.13, The Federal Tort Claims Act: Exceptions to Liability, p. 1655 (1956).

v. *Spelar,* 338 U. S. 217, 219–220. Moreover, as we have said in considering other aspects of the Act: "There is nothing in the Tort Claims Act which shows that Congress intended to draw distinctions so finespun and capricious as to be almost incapable of being held in the mind for adequate formulation." *Indian Towing Co.* v. *United States,* 350 U. S. 61, 68.

Regarding the Court of Appeals' assertion that the Government owed respondents a "specific duty" to make and communicate an accurate appraisal of the property, by virtue of the provisions of the National Housing Act, we have carefully examined the rather extensive legislative history of that statute, giving particular attention to § 226 thereof,[18] and have found nothing from which we may reasonably infer that Congress intended, in a case such as this, to limit or suspend the application of the "misrepresentation" exception of the Tort Claims Act. Long before § 226 was added to the National Housing Act, in 1954, requiring sellers to inform prospective buyers of FHA-appraised value, it had been recognized in Congress that FHA appraisals would be a matter of public record, and would thus inure, incidentally, to the benefit of prospective home purchasers, by affording them the "benefit of knowing the appraised value set upon the property . . . by a trained valuator acting in accordance with a procedure designed to reduce to a minimum, errors that might result from casual or hasty conclusions." [19]

---

[18] 78 Cong. Rec. 11980 *et seq.;* 1st Annual Report of FHA (1935) (*passim*); 100 Cong. Rec. 12349–12360; S. Rep. No. 1472, 83d Cong., 2d Sess.; H. R. Rep. No. 1429, 83d Cong., 2d Sess.; H. R. Conf. Rep. No. 2271, 83d Cong., 2d Sess.; Hearings Before the Senate Committee on Banking and Currency on the Housing Act of 1954, 83d Cong., 2d Sess.; Hearings Before the House Committee on Banking and Currency on Housing Act of 1954, 83d Cong., 2d Sess.

[19] First Annual Report of FHA 17 (1935). See also 90 Cong. Rec. A2985; 78 Cong. Rec. 11981.

But at the same time, it was repeatedly emphasized that the primary and predominant objective of the appraisal system was the "protection of the Government and its insurance funds"; [20] that the mortgage insurance program was not designed to insure anything other than the repayment of loans made by lender-mortgagees; [21] and that "there is no legal relationship between the FHA and the individual mortgagor." [22] Never once was it even intimated that, by an FHA appraisal, the Government would, in any sense, represent or guarantee to the purchaser that he was receiving a certain value for his money.

Nor is there any indication that Congress intended, by its 1954 addition of § 226, to modify the legislation's fundamental design from a system of mortgage repayment insurance to one of guaranty or warranty to the purchaser of value received. On its face, § 226 goes no further than to require that a seller of property approved for FHA mortgage insurance shall furnish to the buyer, prior to sale, a written statement disclosing the FHA-appraised value. [23] That Congress did not thereby intend to convert the FHA appraisal into a warranty of value, or otherwise to extend to the purchaser any actionable right of redress against the Government in the event of a faulty appraisal, was made irrefutably clear in the Committee Hearings in both Houses of Congress, the pertinent excerpts from which are set forth in the margin. [24]

---

[20] H. R. Conf. Rep. No. 2271, 83d Cong., 2d Sess., p. 66.

[21] 78 Cong. Rec. 11981; 1st Annual Report of FHA 15 (1935).

[22] H. R. Conf. Rep. No. 2271, 83d Cong., 2d Sess., pp. 66–67.

[23] Note 9, *supra.*

[24] It was stated by Representative Dollinger, in the Hearings before the Subcommittee on Housing of the House Committee on Banking and Currency on "Housing Constructed Under VA and FHA Programs," 82d Cong., 2d Sess., at 163:

"The Government did not guarantee, on your getting the home, that the home would be in good condition. As I pointed out before,

Moreover, it is not unreasonable to suppose that, at the time § 226 was adopted, Congress was aware of the "misrepresentation" exception in the Tort Claims Act, and that it had been construed by the courts to include "negligent misrepresentation." [25]

The compulsory disclosure provision of § 226 is but one of numerous instances in which Congress has relegated to a governmental agency the duty either to disclose directly, or to require private persons to disclose, information for the assistance and guidance of other persons in the conduct of their economic and commercial affairs. In practically all such instances, it may be said that the Government owes a "specific duty" to obtain and communicate information carefully, lest the intended recipient be misled to his financial harm. While we do not condone carelessness by government employees in gathering and promulgating such information, neither

---

there has been a misconception of the idea. The Government never approved the building. All it says is that the FHA loans are guaranteed to the builder or to the bank."

In the Hearings before the Senate Committee on Banking and Currency on Housing Act of 1954, 83d Cong., 2d Sess., at 1402–1403, the following colloquy was recorded between Senator Bennett and Home Finance Administrator Cole:

"Mr. COLE: . . . I agree with the Senator that the home buyer should understand that the Federal Government is not guaranteeing his home.

"Senator BENNETT: That is correct. . . . The idea of the inspection service under title II is to protect the Federal Government, which undertakes to insure the loan. The fact that the inspection is made, provides collateral benefits to the property owner. There is no question about that. But in the last analysis the property owner cannot say to the Federal Government, 'Well, your inspector inspected my house, and now look what's happened; therefore, you are responsible; therefore, you must come down here and fix it up.' "

[25] *Jones* v. *United States, supra,* and *National Mfg. Co.* v. *United States, supra,* had both been decided, by the Second and Eighth Circuits, respectively, when Congress enacted § 226 in 1954.

can we justifiably ignore the plain words Congress has used in limiting the scope of the Government's tort liability.[26]

It follows that respondents' claim is one "arising out of . . . misrepresentation," within the meaning of § 2680 (h), and hence is not actionable against the Government under the Tort Claims Act. Accordingly, the judgment below must be

*Reversed.*

MR. JUSTICE DOUGLAS dissents.

MR. JUSTICE STEWART took no part in the consideration or decision of this case.

---

[26] Our conclusion neither conflicts with nor impairs the authority of *Indian Towing Co.* v. *United States,* 350 U. S. 61, which held cognizable a Torts Act claim for property damages suffered when a vessel ran aground as a result of the Coast Guard's allegedly negligent failure to maintain the beacon lamp in a lighthouse. Such a claim does not "arise out of . . . misrepresentation," any more than does one based upon a motor vehicle operator's negligence in giving a misleading turn signal. As Dean Prosser has observed, many familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings." Prosser, Torts, § 85, "Remedies for Misrepresentation," at 702–703 (1941 ed.). See also 2 Harper and James, Torts, § 29.13, at 1655 (1956).