**CITY OF GARLAND,**
**Plaintiff–Appellee,**

v.

**ZURN INDUSTRIES, INC., et al., Defendants,**
and
**URS Company, Successor in Interest to Forrest & Cotton, Inc., Defendant–Third Party Plaintiff–Appellant,**

v.

**UNITED STATES of America, Third–Party Defendant–Appellee.**

No. 88–1697.

United States Court of Appeals, Fifth Circuit.

April 21, 1989.

---

22. *Bellis,* 417 U.S. at 90, 94 S.Ct. at 2184.

3. *Id.* at 54, 69 S.Ct. at 1350.

Teresa Jenkins Carson, William R. Allensworth, David Taubenfeld, Haynes & Boone, Dallas, Tex., for appellant.

Bert R. Oastler, Neal J. Sweeney, Atlanta, Ga., for City of Garland, Tex.

Jay Tidmarsh, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., Marvin Collins, U.S. Atty., Dallas, Tex., for U.S.A.

Before POLITZ and JOLLY, Circuit Judges, and HUNTER, District Judge.[*]

E. GRADY JOLLY, Circuit Judge:

In this case we are asked to consider whether the Environmental Protection Agency ("EPA") is protected by the "discretionary function" or "misrepresentation" exceptions to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* ("FTCA"), for any negligence in its analysis, testing, or eventual approval of a physical-chemical waste water treatment process submitted by the City of Garland. Finding that the "misrepresentation" exception, 28 U.S.C. § 2680(h), bars this third-party action against the EPA for contribution, we affirm.

I

This case arose out of the construction of the City of Garland's Duck Creek sewage treatment plant. The City of Garland, Texas ("Garland") turned to URS Company ("URS") in 1969 and 1970 to study ways in which the city's sewage plant could be expanded and improved to meet anticipated Texas and EPA effluent discharge permit requirements. Garland wanted an innovative proposal so that it could receive a construction grant from the EPA. In addition, the city sought to be designated a regional waste water treatment facility so that it would be more likely to be awarded

[*] District Judge of the Western District of Louisiana, sitting by designation.

significant federal funding. In early 1970 Garland contracted with URS to provide a recommendation and design that would meet the EPA's permit requirement. URS designed a physical-chemical ("p-chem") treatment plant which incorporated a technologically innovative carbon adsorption system. Garland applied for and received a substantial grant from the EPA, which financed seventy-five percent of the cost of construction of the Duck Creek project. As part of the application process, before Garland was awarded a grant, the EPA reviewed and approved URS's design.

As design engineer for the project, URS analyzed Garland's sewage, reviewed ten years of data Garland had compiled, and conducted its own treatability tests. Although URS wished to build a scaled-down version of its proposed plant so that the p-chem process could be tested, the EPA rejected Garland's funding request for such a pilot plant. The EPA stated that it had already conducted a wealth of experimentation and studies on p-chem waste treatment, so a test plant was not necessary. Garland declined to fund the pilot plant itself.

Construction of the Duck Creek project was begun in 1974 and the facility began operating in 1977. Soon after the new plant started operations, the system ruptured and could not be repaired to operate as originally intended. The plant did not meet the permit requirements, and as a result the EPA filed suit against Garland in federal district court for violations of the Clean Water Act, 33 U.S.C. § 1311, seeking civil penalties and an abatement of the condition. The City was forced to pay to defend against the environmental enforcement actions brought against it and to redesign the plant in order to bring it into compliance. The EPA withheld certain grant funds until the Duck Creek plant met its permit requirements, which also caused Garland to lose interest and bonding capacity. The EPA's action against Garland was settled by consent decree, establishing interim effluent levels and assessing Garland a substantial penalty. Garland's reconfigured plant only became fully operational in late April 1986.

In 1982 Garland filed suit against URS and other engineering consultants and contractors for the p-chem waste water treatment plant, in an effort to recoup the costs it had incurred under the consent decree. Garland requested over $26 million in damages from URS, alleging that URS's novel physical-chemical process design could never have produced the required effluent quality, and URS had failed to recommend and perform essential pilot scale testing and sufficient waste water testing before recommending the process. See *Zurn Industries, Inc. v. Acton Const. Co.*, 847 F.2d 234 (5th Cir.1988) (related case, reporting additional facts).

In August 1987 URS filed a third-party action against the EPA for contribution as joint tortfeasor. URS's theory was that if Garland were awarded damages against URS, URS should be compensated by the EPA because the EPA's acts or omissions in its review and approval process were negligent and a proximate cause of any injury Garland suffered from any deficiency in the design of the Duck Creek plant. URS's claim evolved into a claim that the EPA had breached its duty to exercise care in the study of p-chem processes before counselling URS on the process and before approving URS's design. URS alleged that it had relied heavily on the EPA's input in making its final recommendation to Garland. URS relied on the EPA's process design manual, met with EPA scientists and engineers for discussion, and combined the results of its own treatability studies with the EPA's scientific data before recommending to Garland that it go ahead with the p-chem process. Further, URS alleged that the EPA itself participated in the analysis and design of the Duck Creek treatment plant, and reviewed and approved the plant's final design and specifications. These were operational functions mandated by EPA regulations, and, it therefore was alleged, the EPA must be liable under the FTCA to Garland for any negligence in their execution.

The United States removed the case to federal court and moved to dismiss URS's claims, asserting that (1) the acts of the

EPA were protected by the "discretionary function" exception to the FTCA; (2) URS was required to file an administrative claim before it brought its third-party action against the EPA; and (3) the doctrine of "derivative jurisdiction" precluded the federal court from obtaining jurisdiction over the removed action.

On March 25, 1988 the court found that the EPA had performed discretionary functions in examining the plans for the plant, in discussing the plans with URS, and in deciding to provide a grant to the city to construct the plant. The court granted EPA's motion to dismiss on this basis, although it noted that any of the three grounds would have sufficed to warrant dismissal.

## II

On appeal URS urges that the district court's dismissal of URS's claims was based on a misunderstanding of those claims. URS explains that its third-party claim against the EPA is based not on EPA's discretionary decision to fund the Duck Creek plant, but on the EPA's nondiscretionary acts in *implementing* its decision to institute a research and development program in order to encourage and develop innovative waste treatment processes. The EPA contributed to Garland's damages by failing to use due care both in conducting its research into the p-chem process, and in reviewing and analyzing the Duck Creek treatment plant design. These involved scientific research and experimentation, and so, URS contends, are not protected by the FTCA as "social, economic or political policy" decisions. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). Further, because the EPA would not provide funds to Garland for a pilot plant for independent testing of the p-chem system, Garland and URS were forced to rely on studies, test results, and information generated by the EPA's research center and disseminated by the EPA's independent research program. The EPA wrongly approved the process, and both Garland

and URS relied to their detriment on that recommendation. For these reasons, it is argued, the EPA must be considered a joint tortfeasor and owe contribution to URS.

The EPA responds in turn that the FTCA's discretionary function exception does bar URS's claims because the EPA is required to weigh environmental and economic policy objectives in reviewing and approving a grantee's design, and Congress gave the EPA complete discretion as to the manner in which it would conduct its research and disseminate the information it gleaned from that research. Moreover, to the extent URS alleges that it relied on the EPA's research data, URS's claim is barred by the FTCA's misrepresentation exception, which has been construed to preclude claims based upon negligence in obtaining and communicating information upon which a party may reasonably be expected to rely in the conduct of his economic affairs. *United States v. Neustadt*, 366 U.S. 696, 706, 81 S.Ct. 1294, 1300, 6 L.Ed.2d 614 (1961).

## III

We turn first to the EPA's argument that 28 U.S.C. § 2680(h), the misrepresentation exception to the government's waiver of sovereign immunity under the FTCA, bars URS's claim for contribution. It is clear from the case law that section 2680(h), stating that the FTCA will not apply to "[a]ny claim arising out of ... misrepresentation," protects the EPA against liability for contribution to URS for any damages Garland incurred as a result of its reliance on data the EPA generated or collected on the p-chem process and shared with URS.

In *United States v. Neustadt*, homebuyers negotiated a purchase price of $24,000 in reliance on an FHA appraisal that negligently misrepresented the value of the home. They sued the government under the FTCA for the difference between the lower fair market value of the property and the price they negotiated on the basis of the FHA appraisal. The district court found the government liable for $8,000. The Fourth Circuit affirmed, but the Su-

preme Court reversed, finding that section 2680(h) excluded from recovery under the FTCA claims arising out of negligent misrepresentation. The Court considered the legislative history of section 226 of the National Housing Act, 12 U.S.C. § 1701 *et seq.*, requiring that a seller of property approved for FHA mortgage insurance "shall agree to deliver, prior to the sale of the property, to the person purchasing such [property], a written statement setting forth the amount of the [FHA] appraised value ...," and found nothing from which it could infer that Congress intended to limit or suspend the application of the "misrepresentation" exception of the Tort Claims Act in the Neustadts' situation:

> Long before § 226 was added to the National Housing Act, ... it had been recognized in Congress that FHA appraisals would be a matter of public record, and would thus inure, incidentally, to the benefit of prospective home purchasers, by affording them the "benefit of knowing the appraised value set upon the property * * * by a trained valuator ...."
>
> But at the same time, it was repeatedly emphasized that the primary and predominant objective of the appraisal system was the "protection of the Government and its insurance funds"; ... that "there is no legal relationship between the FHA and the individual mortagor." Never once was it even intimated that, by an FHA appraisal, the Government would, in any sense, represent or guarantee to the purchaser that he was receiving a certain value for his money.

366 U.S. at 708–09, 81 S.Ct. at 1301 (footnotes omitted). Accordingly, the Supreme Court in *Neustadt* found no "specific duty" on the part of the FHA to make and communicate an accurate appraisal by virtue of the provisions of the National Housing Act, and therefore no actionable right of redress against the Government in the event a faulty appraisal was given. 366 U.S. at 708–09, 81 S.Ct. at 1301–02.

In *Baroni v. United States*, 662 F.2d 287 (5th Cir.1981), purchasers of subdivision housing units sued the government under the FTCA to recover for flood damage. The FHA had miscalculated the predicted fifty-year flood height and approved the subdivision so that loans made on residences constructed within the subdivision would be eligible for government-insured financing. After houses were constructed, the subdivision flooded twice and the plaintiffs' homes were damaged. This circuit found that no federal duty to provide housing safe from flooding was imposed on the government by the National Housing Act.

> While the information supplied by the government may 'inure, incidentally, to the benefit of prospective home purchasers,' the primary purpose of the government's undertaking is to make sure that homes receiving FHA mortgages are constructed to standards warranting mortgage guarantee protection.... Congress did not intend 'to extend to the purchaser any actionable right of redress against the Government in the event of a faulty appraisal....'

662 F.2d at 289 (citations omitted). The panel held that even if the government's undertaking had created a duty under state law to determine the flood level nonnegligently, the damages complained of resulted from the communication of the government's miscalculation, and the misrepresentation exception barred the purchasers' claims. *Id.*

The instant case is not materially distinguishable from *Baroni* or *Neustadt*. It has not been shown that the EPA owed Garland any duty whatsoever on which URS can premise its claim for contribution, either to counsel on the p-chem process or to compile accurate information.

The EPA's authority to conduct research and to make grants derives from the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act, 33 U.S.C. § 1251 *et seq.*[1] The Act's objective was to "restore and maintain the chemical, physical and biological integrity of the Na-

---

**1.** All references are to the Clean Water Act in effect in 1973 and 1974, when the actions in this case occurred, unless otherwise noted.

tion's waters," 33 U.S.C. § 1251(a), and to that end, under the Act Congress delegated broad authority to the EPA to establish national programs, conduct research, and develop effective processes for the prevention, reduction and elimination of pollution. 33 U.S.C. § 1254(a), (a)(1), (b)(7), (d). The EPA was authorized to collect the results of its research and other activities and make them available to the public, along with appropriate recommendations. 33 U.S.C. § 1254(b)(1), (b)(6). The Act also provided for financial-assistance grants for the construction of publicly owned treatment works meeting various criteria. 33 U.S.C. § 1281(g)(1). *See generally* 40 C.F.R. § 30.100 *et seq* (1973) (general grant regulations) and 40 C.F.R. § 35.900 *et seq* (1973) (specific grant regulations for construction of treatment works).

URS urges that the mandatory language of 40 C.F.R. §§ 35.925 and 35.925–7(b) (1973) demonstrates that the EPA owed Garland a statutory duty to review Garland's proposal and warrant that it would meet the applicable permit requirements. These regulations state that

> Before awarding initial grant assistance for any project for treatment works the Regional Administrator shall determine:
>
> ....
>
> ... [t]hat such works will meet applicable effluent limitations and applicable water quality standards and attain not less than secondary treatment....

■ Although this regulation places on the EPA a duty to review and evaluate proposed treatment works designs before awarding a grant of government funds, it serves as no guarantee to any grantee that the grantee's plans will satisfy the applicable effluent limitations. 40 C.F.R. § 30.600 (1973), in effect at the time the City of Garland's construction grant was approved, specifically dictated that "[t]he primary responsibility for administration of a grant must remain with the grantee, who is responsible for the success of the project for which the grant was made." That section continued:

Although grantees are encouraged to seek the advice and opinions of EPA on problems that may arise, the giving of such advice shall not shift the responsibility for final decision to EPA. The primary concern of EPA is that granted funds be used to achieve the objectives of the grant project in a manner that will accord with program objectives and will make a maximum contribution to the betterment of the environment. Grantees and those assisting them on project work must direct their efforts to this end.

It is plain that the intent of the EPA's regulations regarding the review and approval of construction grants under the Act is to ensure that federal funds are most effectively spent to achieve the central purpose of the Act—to eliminate the discharge of pollutants into the nation's waters. *See generally* 40 C.F.R. §§ 35.915, 35.920 *et seq.* (1973); 40 C.F.R. § 35.915 (1988). For the same reasons that the Supreme Court in *Neustadt* and this circuit in *Baroni* held that the National Housing Act created no actionable duty running from the FHA to homebuyers, in this case we hold that the Clean Water Act imposed no duty on the EPA which would limit or suspend the application of the "misrepresentation exception" to the FTCA.

The respective requirements found in *Neustadt* and *Baroni* that the FHA perform appraisals on property prior to its sale and calculate the predicted fifty-year flood height prior to approving a subdivision for government-insured financing were imposed predominantly for the "protection of the government and its insurance funds," *Neustadt,* 366 U.S. at 709, 81 S.Ct. at 1301, and to "make sure that homes receiving FHA mortgages are constructed to standards warranting mortgage guarantee protection," *Baroni,* 662 F.2d at 289. In the instant case, the Clean Water Act's regulations requiring review and approval of construction grants and treatment plant designs are also primarily for the purpose of ensuring that the government's investment in these projects is put to best use to improve the quality of the environment. Although the City of Garland may have been an incidental beneficiary of a determi-

nation by the EPA that the Duck Creek Plant would achieve its permit requirements, it is apparent that the environment itself was the intended beneficiary of the EPA's research efforts and its construction grant administration. *See* 33 U.S.C. §§ 1251, 1254. *Cf. Neustadt*, 366 U.S. at 708, 81 S.Ct. at 1301 (FHA appraisals inure only incidentally to the benefit of prospective homeowners); *Baroni*, 662 F.2d at 289 (flood height calculations inure only incidentally to the benefit of prospective homebuyers). We therefore find that the applicable regulations of the Clean Water Act imposed no duty on the EPA to warrant to Garland that its plant would meet its permit requirements, which would suspend application of the misrepresentation exception. *Cf. In re Air Crash Disaster Near Silver Plume*, 445 F.Supp. 384, 405–09 (1977) (Federal Aviation Act of 1958 and its regulations create an actionable duty on the part of the FAA personnel to air passengers, pilots and personnel to carry out operational activities under the Act in a nonnegligent manner).

In addition, to the extent that URS bases its claim for contribution on inaccurate data or test results the EPA furnished to Garland or to it as Garland's agent, this claim is clearly barred by the misrepresentation exception to the FTCA. The FTCA does not allow for the recovery of damages resulting from the government's negligence in obtaining and communicating information. *Neustadt*, 366 U.S. at 706, 81 S.Ct. at 1300; *Baroni*, 662 F.2d at 289.

Because federal courts lack subject-matter jurisdiction to entertain claims against the United States falling within one of the statutory exceptions to the FTCA, URS's third-party claims against the EPA, alleging damages resulting from its reliance on information the EPA generated negligently and communicated, were properly dis-

missed by the district court under the FTCA's misrepresentation exception, 28 U.S.C. §§ 1346, 2680(h).[2]

## IV

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**2.** Although we need not decide this issue in view of our holding above that the misrepresentation exception bars URS's claims, we note that the "discretionary function" exception, relied on by the district court, also does not seem misapplied here. It is not disputed that the EPA's decision to approve the Duck Creek p-chem process, as the district court held, was the exercise of a discretionary function. Further, the EPA was under no contractual or other duty to provide URS with information URS could use to profit through its contract with Garland; the EPA was simply performing a public service in counselling both Garland and URS prior to its approval of Garland's Duck Creek proposal.