SHEPHERD, J.,
dissenting.
The labor expended by the majority to keep Kenneth Smith’s widow in her home is admirable. Unfortunately, the legal analysis used does not measure up. For this reason, I respectfully dissent.
I.
The central issue in this case is whether there was a default under the mortgage, authorizing Reverse Mortgage Solutions, Inc., to foreclose. Reverse Mortgage Solutions asserts there was a default under Paragraph 9(a)(i) of the mortgage. This paragraph reads as follows:
*229 9. Grounds for Acceleration of Debt,
(a) Due and Payable. Lender may require immediate payment in full of all sums secured by this Security Instrument if:
(i) A Borrower dies and the Property is not the principal residence of at least one surviving borrower, or
[[Image here]]
(underline emphasis added).
The applicable acceleration clause in the mortgage is triggered when: (1) a Borrower dies; (2) there is a-“surviving borrower;” and (3) the property is not the residence of a surviving borrower. It was Reverse Mortgage Solution’s burden at trial to prove the existence of the default. The Court has not been provided with a transcript of the trial, and the form Final Judgment of Foreclosure includes no findings of fact. It merely states, “On the evidence presented, IT IS ORDERED AND ADJUDGED that Plaintiffs Final Judgment of Foreclosure is GRANTED.” The trial court may have reasoned in one of two ways: (1) Final Judgment of Foreclosure was warranted because Celia Smith is not a “Borrower” under the mortgage; or (2) Celia Smith was a “Borrower,” but a Final Judgment of Foreclosure was nevertheless warranted because by the date of the' trial, the home was no longer her “principal residence.” The majority grounds its reversal of the Final Judgment of Foreclosure in this case on its belief that “The trial court found that all conditions precedent had occurred based upon its legal conclusion that Mrs. Smith was not a ‘Borrower’ under the mortgage.” Maj. Op. at p. 224. There is no record support for the statement. - The Court may as well have reasoned that Celia Smith was a “Borrower” but no longer made the home her “principal residence.” [13]
This case should be affirmed on the strength of Applegate v. Barnett Bank of Tallahassee, 377 So.2d 1150 (Fla.1979). As the Florida Supreme Court explained, “Even when based on erroneous reasoning, a conclusion or decision of a trial court will generally be affirmed if the evidence or an alternative theory supports it.” Applegate, 377 So.2d at 1152 (emphasis added). I do not believe Celia Smith was a “Borrower,” as will be demonstrated below, but even if she was, the record of proceedings may have included an alternate ground for affirmance if one had been brought to us. We should affirm the Final Judgment of Foreclosure in this case for lack of a complete record.
II.
If it is necessary to join issue on the question of whether or not Celia Smith is a “Borrower” under the mortgage document, I conclude she is not. The mortgage document in this case is a home equity conver *230 sion mortgage, insured by the United States Department of Housing and Urban Development Home Equity Conversion Mortgage (HECM) Program for Elderly Homeowners, under 12 U.S.C.A. § 1715z-20. The mortgage and associated promissory note are . HE CM form contract documents which follow the statute. The face of the mortgage identifies the decedent, Kenneth Smith, and no other person, as the “Borrower”:
State of Florida
ADJUSTABLE RATE
HOME EQUITY CONVERSION MORTGAGE
THIS MORTGAGE (“Security Instrument”) is given on May 08, 2008. The mortgagor is KENNETH S. SMITH, A MARRIED MAN, whose address is 9991 SW 154TH AVENUE, MIAMI, FL 33196 (“Borrower”). ... The agreement to repay is evidenced by Borrower’s Note dated the same date as this Security Instrument (“Note”). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note ... up to a maximum principal amount Five Hundred Forty-Four Thousand One Hundred Eighty-Five and 00/100 Dollars ($544,185.00). .,. The full debt, including all amounts described in (a), (b), and (c) above, if not paid earlier, is due and payable on September 07, 2086. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in MIAMI-DADE county, Florida:
The real property located at 9991 SW 154th Avenue, Miami, FL, in the County of Miami Dade, state of FL, described more fully on Exhibit A attached to this mortgage.
(underline emphasis added).
The majority counters that Celia Smith must be a “Borrower” under the mortgage because she signed it. The signature block, found on the last page of the mortgage document, does indeed bear Celia Smith’s signature. It' reads as follows:
BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any.rider(s) executed by Borrower and recorded with it.
Witness: /s/
/s/
Signature:
[[Image here]]
[[Image here]]

/s/ Kenneth S. Smith

/s/ Celia Smith

CELIA SMITH
However, there is nothing in the signature block (or elsewhere in the mortgage document) that indicates Celia Smith signed the document as a “Borrower.” In fact, the language of the signature block continues to reference a single “Borrower,” just as does the opening paragraph of the mortgage quoted above.[14]
*231 The only argument the majority offers to the contrary is its statement that “Mrs. Smith’s signature was no accident” because “it was pre-printed on the document below the line she was required to sign.” All can concede that her signature on the document was arranged with forethought and was not an accident. However, that just begs the question of the purpose of the drafters in requiring her signature.
The majority recognizes that a necessary purpose for the signature is that the mortgage would have been unenforceable absent Celia’s joinder in the document. See Art. X, § 4(c), Fla. Const. (“The owner of homestead real estate, joined by the spouse if married, may alienate homestead by mortgage, sale, deed or gift ..."); Pitts v. Pastore, 561 So.2d 297, 301 (Fla. 2d DCA 1990) (holding that a mortgage is ineffectual as a lien until such time as either the spouse joins in the alienation or the property loses its homestead status.). This imputation of purpose for Celia Smith’s signature is harmonious with the evident intent of the drafters in the first paragraph of the mortgage document. The additional imputation, interpretively imposed on the mortgage document by the majority, conflicts with the unambiguous definition and identity of the “Borrower” in the first paragraph of the document. It is a basic principle of statutory and contractual interpretation that where one interpretation of a statute or contract appears to conflict with another, the courts will choose an interpretation which harmonizes the conflicting interpretations wherever possible. See Homestead v. Johnson, 760 So.2d 80, 84 (Fla.2000) (“[W]e rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof.”); see also Triple E Dev. Co. v. Floridagold Citrus Corp., 51 So.2d 435, 438-39 (Fla.1951) (“[I]f clauses in a contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them if possible; if one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability”). We should do so in this case.
The conclusion reached by the majority that Celia Smith is a “Borrower” on the mortgage is also counter to the express terms of the promissory note. The promissory note defines the “Borrower” as meaning “each person signing at the end of this Note.” The only person who signed the promissory note was the decedent, Kenneth Smith. Moreover, the promissory note contains substantially identical acceleration language to that found in the mortgage document. Paragraph 7 of the promissory note reads as follows in relevant part:
7. IMMEDIATE PAYMENT IN FULL
(A) Death or Sale
Lender may require immediate payment in full of all outstanding principal and accrued interest if:
(i) A Borrower dies and the Property is not the principal residence of at least one surviving borrower, or ...
(underline emphasis added). The decision of the majority creates the anomalous result that the “Borrower” — expressly defined in two simultaneously executed and related documents to be Kenneth Smith— now has two meanings. Although I am *232 unwilling to place my total confidence in the federal" drafters of these'financial instruments (see Part III, infra), I do- give them more credit than does the majority in their ability to use the same word, in the same fashion, at the same time, in the same transaction.
Finally, the use of a single-borrower reverse mortgage vehicle by a married couple is not ipso facto nefarious. The calculation of the amount that can be borrowed and the size of the resulting line of credit, lump sum, or periodic payment available to the borrower varies with the age of the borrower.. See Plunkett v. Castro, 67 F.Supp.3d 1 (D.D.C.2014) (explaining why an older borrower will almost always be able to receive a bigger loan amount). One might envision many circumstances— e.g., the need for a significant, large lump sum to apply to a medical emergency— where a married couple might find a single-borrower reverse mortgage to be appropriate for their needs. By its decision today, the majority imposes its own collec-tivistic view of life planning on a cadre of seniors who have demonstrated they are capable of amassing wealth and governing their own affairs. We should allow the citizenry to be their own deciders.
III.
The final question is whether the fact that the mortgage in this case is insured under the federal Home Equity Conversion Mortgage Program for Elderly Homeowners compels a contrary conclusion. The majority is of two minds on the question. The majority first agrees that “the plain language of the statute imposes an obligation only on the Secretary of HUD [15] with regard to the provisions that must be contained in reverse mortgages insured by HUD” but in the next breath incorporates section 12 U.S.C.A. § 1715z-20(j) into the mortgage document in this case. Maj. Op. at pp. 227-28 (emphasis added). The majority was right the first time.
The language relied upon by the majority reads as follows:
The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner’s obligation to satisfy the loan obligation is deferred until the homeowner’s death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary. For purposes of this subsection, the term “homeowner” includes the spouse of a homeowner.
12 U.S.C.A. 1715z-20(j). However, the majority fails to appreciate that at the time Kenneth Smith signed the mortgage document and promissory note, the Secretary was promoting and cheerfully insuring single-borrower home equity conversion mortgages in circumstances of the type before us. Thése actions were based on a rule sentiently created by the Secretary, which the Secretary has since all but admitted directly conflicted with 1715z-20(j), and which the United States District Court for the District of Columbia has recently confirmed to be so. Bennett v. Donovan, 4 F.Supp.3d 5, 8, 2013 WL 5424708 at *1 (D.D.C.2013). The rule read as follows:
The mortgage shall state that the mortgage balance will be due and payable in full if a mortgagor dies and the property is not the principal residence of at least one surviving mortgagor, or a mortgagor conveys all or [sic] his or her title in the property and no other mortgagor retains title to the property.
24 C.F.R. § 206.27(c)(1) (adopted August 16, 1995). Asked by the United States *233 Court of Appeals for the District of Columbia Circuit during an intermediate appellate phase of the Bennett litigation to justify the rule in the face of the governing statute, the only explanation the Secretary could muster for flouting the plain language of the federal statute was “concern[] about the scenario in which a homeowner, after taking out a reverse mortgage, marries a spouse — particularly a young spouse — and thereby significantly increases a lender’s risk.” Bennett v. Donovan, 703 F.3d 582, 586 (D.C.Cir.2013).[16] More recently, just five months ago — perhaps recognizing that the United States Congress was right all along or, forfend, having a momentary mental relapse to that quaint time in the past when it was dogma that the Congress made the laws and the Executive carried them out— the Secretary, at great expense and additional program risk, is now offering to purchase single-borrower home equity loans of the type involved in this case from the private lenders who funded them and allowing the non-borrowing spouse to remain in the home until she dies or leaves the residence. See Letter 2015-03 from U.S. Dep’t of Hous. and Urban Dev., to All Approved Mortgagees at p. 8 et seq. (January 29, 2015) (on file with author).
In all of this, HUD recognizes that section 1715z-20(j) does not empower it to void or' alter the terms of a bona fide mortgage contract between a “Borrower” and a private lender. Id. at p. 3; Bennett v. Donovan, 797 F.Supp.2d 69, 77 (D.D.C.2011) (“As the Secretary points out, whether the mortgages were properly insured or not does not affect the mortgage’s own contractual terms, and it is these terms that require Plaintiffs spouses’ estates to repay the mortgages or sell the houses.”); see also United States v. Neustadt, 366 U.S. 696, 709 and n. 24, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) (finding that existence of mortgage insurance program did not create a legal relationship between the government and the individual mortgagor.). Yet, the majority somehow seeks to empower HUD where Congress through section 1715z-20(j) does not. Perhaps the majority is swayed by the initial-appearing heavy-handedness or unfairness of the program. However, there is no allegation of fraud, misrepresentation, or trickery in this case, and fairness is in the eye of the beholder. As explained in full detail in Plunkett, HUD incentivized this program in this fashion. It does not follow that just because HUD went rogue, agreements made between private parties are ipso fac-to unenforceable. In this case, a private lender and a private individual made their own private deal. We should not contort ourselves to impose our own view of what is right or good. “Law is something more than will exerted as an act of power.” Hurtado v. California, 110 U.S. 516, 535, 4 S.Ct. 111, 28 L.Ed. 232 (1884).
I would affirm the decision of the trial court.

. The "principal residence" issue was squarely before the trial court. In her Answer, Celia Smith asserted- as a defense that "This mortgage should not be accelerated as the defendant, CELIA ELMIRA SMITH, is still alive and living in the real property as her homestead." (emphasis added). The majority seeks solace from the fatal flaw in its reasoning in this case by latching onto a statement of Reverse Mortgage’s counsel on an unsworn form required for the processing of residential foreclosure cases during the foreclosure crisis, which was filed with the complaint in foreclosure in this case. See ff. 2. The form can provide no succor to the majority. Pleadings and attachments are no substitute for a trial transcript and exhibits. See Fallon v. City Furniture, 959 So.2d 306 (Fla. 3d DCA 2007) ("Pleadings are inadmissible to prove a fact in issue,”). Nor does the form contribute any information concerning whether Ms. Smith resided on the property as of the date of trial, which no one contests as being the critical moment. Sée Majority Op. at p. 224.

. The majority insinuates that Celia Smith “may have been in title to the property at the time Kenneth Smith executed the mortgage. The majority places its reliance for this inference on the allegation found in Paragraph 7 of the Verified Complaint for foreclosure that “Defendant(s), CELIA ELMIRA SMITH, own(s) the property.” Of course, the Verified Complaint for foreclosure was filed after Kenneth Smith’s death. Ironically, if one were to carry the insinuation of the majority to its logical conclusion, then Celia Smith would be a borrower, liable under the promissory note as well. See Maj. Op. at p. 226 (" ‘BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in the Security Instrument ...’ ”); see also R, at 16 (“[Mortgage Agreement Paragraph 1:] Payment of Principal and Interest. Borrower shall pay when due the principal of, and inter *231 est on, the debt evidenced by the note.”). The logic of the majority has the additional unintended consequence of placing Reverse Mortgage Solutions, Inc. in violation of 12 C.F.R. § 202.7(d)(1) (2014) (“A creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit.”).

15. The United States Department of Housing and Urban Development.

. Technically speaking, the HECM program is administered by Federal Housing Administration, commonly known as the FHA. The FHA is an agency housed within the United States Department of Housing and Urban Development. The FHA was created pursuant to the National Housing Act of 1934, Pub. L. No. 73-479, 48 Stat. 847 (1934), and has long had as its purpose the expansion of mortgage access and the enablement of home ownership. In this case, it simply forgets its place in our constitutional firmament.