E. Catherine LOVEJOY, Plaintiff,

v.

Joseph SALDANHA, Mahmood Partovi, Larry Keeton, Dallas Healthcare, Inc., dba Doctor's Hospital, and Secretary, Department of Housing and Urban Development, Defendants.

Civ. A. No. 2:92–0997.

United States District Court,
S.D. West Virginia,
Charleston Division.

Dec. 3, 1993.

Walton S. Shepherd, III, Sissonville, WV, for plaintiff.

R. Joseph Zak, Charleston, WV, for defendant Saldanha.

Mary Jo Allen, Kay, Casto, Chaney, Love & Wise, Charleston, WV, for defendant Partovi.

Charles L. Woody, Paula L. Durst, Niall A. Paul, Spilman, Thomas & Battle, Charleston, WV, for defendant Keeton.

No appearance for defendant Dallas.

Charles T. Miller, Acting U.S. Atty., Gary L. Call, Asst. U.S. Atty., Charleston, WV, for defendant Secretary HUD.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is the United States' motion for summary judgment. On August 7, 1992, Plaintiff brought this action in the Circuit Court of Kanawha County, West Virginia seeking compensatory and punitive damages for alleged sexual harassment by Defendant Larry Keeton. The United States removed the action to this Court on October 27, 1992. By Order entered November 30, 1992, the Court placed the action on the inactive docket to allow Plaintiff to pursue an administrative claim with the United States Department of Housing and Urban Development ("HUD") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671–2680.

Plaintiff filed her administrative claim on December 21, 1992, and HUD denied the claim on March 4, 1993. The Court reinstated the case to the active docket on May 3, 1993. On September 21, 1993, the United States filed its motion for summary judgment. Plaintiff has not responded or otherwise replied to the government's motion.

I.

On July 10, 1989, Defendant Dallas Healthcare, Inc. ("Dallas") purchased Doctors Hospital, which operated at the time in South Charleston, West Virginia.[1] Dallas bought the hospital in a bankruptcy sale, and financed its purchase by obtaining a mort-

---

1. On a motion for summary judgment, once the moving party has met its initial burden of showing there exists no genuine issue of material fact, the burden shifts to the non-moving party to "establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Because Plaintiff has failed to respond to the government's motion for summary judgment, it has failed to meet this burden. The Court therefore accepts the government's factual allegations as undisputed. See, e.g., Peterson v. UMWA, Dist. 29, 1992 WL 500488, at *1 (S.D.W.Va. Nov. 17, 1992) [facts as set forth in defendant's memorandum and supporting affidavits and exhibits are deemed to be true where plaintiffs failed to respond to motion for summary judgment].

gage insured by the Department of Housing and Urban Development ("HUD").[2] To safeguard the financial viability of the hospital, HUD entered into a regulatory agreement with Dallas governing the parties' rights and responsibilities relating to the hospital's operation.

HUD's relationship with Dallas quickly became contentious. HUD and Dallas litigated disputes concerning alleged transfers of ownership interests, changes in management and HUD's rights under the regulatory agreement to approve such transfers and management changes. Management of the hospital shifted several times. By fall, 1991, the hospital was beset by severe financial difficulties, and on February 1, 1992, Dallas defaulted on its mortgage.

In an effort to revive the hospital, Dallas hired Defendant Larry Keeton to serve as the hospital's administrator. Dallas notified Keeton by letter dated May 20, 1992, its board of directors had appointed him administrator, and that he would receive a salary of $6,000 per month. Dallas had previously notified HUD it intended to hire Keeton. HUD replied by letter dated April 30, 1992 that although it did not "in principle oppose the employment" of Keeton, his hiring "would constitute a change in management and will require HUD and Department of Health and Human Services ("HHS") to review and approve any contractual employment arrangement or management agreement."

HUD specifically explained in the letter the purpose of its review and approval of the employment contract: "The review by HUD and HHS is to determine that the terms, compensation, scope of services and general contract requirements contain arm's length provisions, plus are reasonable and customary for a medical facility of this size and type."

After reviewing the proposed employment contract between Keeton and Dallas, HUD notified Dallas by letter dated May 22, 1992, of its objections to the contract. HUD's greatest concern with the contract involved the compensation Keeton was to receive. While it did not regard as excessive Keeton's base salary of $72,000 a year, HUD found a provision in the contract providing for salary increases to $84,000 on May 25, 1992, and to $96,000 one month later to be "unreasonable for Doctor's [sic] Hospital at the present time and given the financial condition of the hospital." HUD recommended the contract be approved conditionally, pending "mutual resolution" of Keeton's compensation.

On May 28, 1992, Dallas submitted for HUD's consideration an amended employment contract, reducing somewhat Keeton's proposed compensation. Again, HUD expressed concern that Keeton's salary under the amended contract was excessive. By letter dated June 5, 1992, HUD requested Dallas and Keeton incorporate into the contract specific changes recommended by HHS, including reductions in Keeton's compensation. This letter led to additional negotiations and proposed revisions to the contract.

By letter dated June 15, 1992, HUD notified Dallas it accepted one term of the renegotiated contract regarding severance pay, but insisted on adoption of all other provisions outlined by HHS. HUD never received a response, apparently because Keeton left the hospital shortly afterward. On July 29, 1992, Dallas voluntarily surrendered possession of the hospital to HUD.

## II.

Plaintiff Lovejoy worked at the hospital between April and June 5, 1992, on assignment from a temporary-employment services agency. The hospital hired Plaintiff on June 5, 1992, to serve as its director of business operations. In this action, Plaintiff alleges Keeton sexually harassed her during her employment at the hospital.

Plaintiff described the alleged harassment in a letter to Dallas' board of directors, stating Keeton started sexually harassing her "[f]rom the first moment [they] met...." Plaintiff contends Keeton on various occasions grabbed, hugged, and tried to kiss her,

2. HUD is authorized to provide mortgage insurance for hospitals by the National Housing Act of 1934, as amended. 12 U.S.C. § 1715z–7.

"stalked" her throughout the workday, made sexually explicit comments to her both privately and in the presence of her co-workers, and approached her with sexual propositions. She states Keeton's purported misconduct occurred every day she worked at the hospital.

Plaintiff complains she confronted Keeton about his conduct repeatedly; but to no avail, and that frustrated and fearing for her safety, she resigned from her position on June 16, 1992. Plaintiff avers the emotional distress she suffered as a result of Keeton's actions compelled her to attempt suicide about a week after leaving her job, and rendered her psychologically traumatized and incapable of holding employment.

Plaintiff's theory of the government's liability is obscure. Apparently, Plaintiff targets the government because HUD allegedly approved Keeton's employment as hospital administrator. Plaintiff cites no source of a duty on HUD's part benefitting her, and alleges only that HUD approved the terms and conditions of Keeton's employment while "acting to protect its security...."

### III.

Under *Rule* 56(c), Fed.R.Civ.P., summary judgment is proper only:

"[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

■ A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden the nonmoving party cannot rely on its pleadings, but instead must have evidence showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

### IV.

Under the FTCA,[3] the United States can be held liable in tort only:

[F]or money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b) (emphasis added).

■ To prevail against the government under § 1346(b) and West Virginia law, Plaintiff must prove that the government owed her a duty; that the government negligently or wrongfully breached that duty; and that Plaintiff was injured as a proximate result of the breach. *Sewell v. Gregory,* 179 W.Va. 585, 371 S.E.2d 82, 84 (1988). Plaintiff's claim against the government cannot survive, for she has failed to establish the existence of a duty on the government's part.

■ The pleadings and exhibits establish HUD's role in this case was simply that of Dallas's mortgage insurer.[4] As such, the

---

**3.** The FTCA provides the exclusive remedy for claims against the United States sounding in tort. 28 U.S.C. § 2679.

**4.** Although the Complaint is unclear, Plaintiff does not appear to suggest an employer-employee relationship existed between HUD and Keeton. Plaintiff has raised no facts which would support such a claim. Even if Plaintiff were to

establish such a relationship, that alone would not suffice to establish HUD's liability for Keeton's alleged conduct. Employers are not automatically liable for sexual harassment by their supervisors or other employees. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986); *Hopkins v. Shoe Show of Virginia, Inc.,* 678 F.Supp. 1241, 1245

government had an obvious interest in ensuring Dallas repaid its loan. To protect this interest, HUD exercised its statutory authority to regulate and restrict a hospital's "charges and methods of financing . . . ." 12 U.S.C. § 1715z–7(d)(1). HUD may "make such contracts . . . as [it] may deem necessary" as an aid to the regulation of hospitals it finances. *Id.* The purpose of these contracts, such as the regulatory agreement between HUD and Dallas, is to protect the government from waste or mismanagement by requiring hospitals to observe sound financial practices.

The regulatory agreement in this case did not authorize HUD to select, supervise, or control Dallas's employees. Instead, its provisions, which required payments for services and supplies "shall not exceed the amount ordinarily paid" and that the terms of managerial services contracts be "arms length" and "fair and reasonable," were designed to protect HUD's interest in the financial practices of the hospital. HUD's dispute with Dallas regarding Keeton's employment did not concern Keeton's qualifications, but dealt with his compensation, an issue clearly within HUD's scope of concern in its role as mortgage insurer.[5]

In *United States v. Neustadt,* 366 U.S. 696, 709, 81 S.Ct. 1294, 1301, 6 L.Ed.2d 614 (1961), the Supreme Court held the mortgage insurance program "was not designed to insure anything other than the repayment of loans made by lender-mortgagees" and that "there is no legal relationship between the FHA [Federal Housing Administration] and the individual mortgagor." *Id.* (citations omitted). The *Neustadt* Court held the FHA residential appraisal requirement does not extend to the purchaser any actionable right of redress against the government in the event of a faulty appraisal. *Accord Moody v. United States,* 774 F.2d 150, 157–58 (6th Cir.1985), *cert. denied,* 479 U.S. 814, 107

S.Ct. 65, 93 L.Ed.2d 24 (1986); *Ortiz v. United States,* 661 F.2d 826, 831 (10th Cir.1981).

Likewise, HUD's insurance of Dallas' mortgage, and its resulting right to review managerial contracts, did not create an actionable right against the government in favor of the Plaintiff. The purpose of the regulatory agreement was to protect HUD's interest in the hospital's financial soundness. The agency's actions regarding Keeton's employment contract furthered that objective by ensuring the contract was consistent with the hospital's financial position.

Accordingly, the Court finds the United States is entitled to summary judgment as a matter of law. The Court **GRANTS** the government's motion for summary judgment, and dismisses Plaintiff's claims against the government.

### V.

Because Plaintiff's claims against the government are dismissed, no federal claims remain in this action. If the federal claims in a federal-court action are dismissed prior to trial, remaining state claims generally should be dismissed as well. *UMWA v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Revene v. Charles County Comm'rs,* 882 F.2d 870, 875 (4th Cir.1989); *O'Hara v. Kovens,* 473 F.Supp. 1161, 1167 (D.Md.1979). The Court finds considerations of judicial economy, convenience, and fairness to the litigants require it to decline to exercise jurisdiction over Plaintiff's remaining claims.

Accordingly, the Court **ORDERS** this action remanded to the Circuit Court of Kanawha County, West Virginia for further proceedings.

---

(S.D.W.Va.1988) (Haden, C.J.); *Paxton v. Crabtree,* 184 W.Va. 237, 400 S.E.2d 245, 253 (1990).

**5.** By failing to respond to the government's requests for admissions, Plaintiff has admitted she is aware of no evidence establishing the government, HUD, or any federal employee or agency supervised or controlled Keeton, had authority to

supervise Keeton, or is responsible for Keeton's alleged wrongful acts or for the acts of the other parties defendant. A party who fails to answer requests for admissions within the appropriate period is deemed to have admitted the matters asserted. *Rule* 36(a), Fed.R.Civ.P.