In re Sharon BROWN, Debtor.

Sharon Brown, Plaintiff,

v.

Countrywide Home Loans, Inc., et al., Defendants.

Bankruptcy No. 01–1808.
Adversary No. 02–10032.

United States Bankruptcy Court, District of Columbia.

Oct. 28, 2004.

Jared K. Ellison, for plaintiff.

Mark G. Chalpin, Silver Spring, MD, for defendants Patrick Carr and Housing Made Simple.

*DECISION REGARDING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS PATRICK CARR AND HOUSING MADE SIMPLE*

S. MARTIN TEEL, JR., Bankruptcy Judge.

This matter came before the court at a hearing on July 7, 2004, on the Motion for Summary Judgment of defendants Housing Made Simple ("HMS") and Patrick

Carr (Docket Entry ("DE") No. 66, filed September 5, 2003).

The debtor, Sharon Brown, filed the above-captioned adversary proceeding against HMS, Carr, Countrywide Home Loans, Kelly Hutchinson, Thomas Thur, and Mortgage Edge Corporation. Carr and HMS have moved for Summary Judgment as to Brown's claims against them for Negligence, Breach of the Covenant of Good Faith and Fair Dealing, and Fraudulent and Negligent Misrepresentation arising out of Brown's purchase and rehabilitation of a home under the 203(k) Home Improvement Loan Program of the Department of Housing and Urban Development ("HUD").

According to HUD's 203(k) handbook (Def.'s Ex. 1), the 203(k) program is designed to enable home buyers to obtain a single, long-term mortgage for both the purchase and rehabilitation of a house that is in need of extensive renovation. The home buyer can borrow funds from a HUD-approved lender and HUD, in turn, will insure the loan. The amount of the mortgage is based on the projected value of the property after rehabilitation. Therefore, the mortgage is divided into two parts, with a certain portion attributable to the "as is" value of the property and a certain portion earmarked for rehabilitation and placed in a "Rehabilitation Escrow Account." Funds remain in the escrow account throughout the rehabilitation of the property and may be released from the escrow account to the borrower as portions of the rehabilitation are completed. In order for the funds to be released, a HUD-approved fee inspector must inspect the work, and certify, along with the contractor performing the renovation, and the borrower, that the work has been completed in a workmanlike manner and must indicate the cost of each portion of the completed rehabilitation.

In June 2000, Brown purchased a home through the 203(k) program. Pursuant to the HUD 203(k) program, Brown received the benefit of a single mortgage, insured by HUD, for both the purchase and rehabilitation of her home. The plaintiff hired Kelly Hutchinson as a General Contractor and Thomas Thur as a "Rehabilitation Specialist" to conduct periodic inspections and approve the draw requests as Hutchinson completed portions of the rehabilitation. However, after Thur conducted two inspections, the original lender, Mortgage Edge, hired HMS to conduct the remaining seven draw inspections. HMS employees, who were all certified under the 203(k) program, conducted a total of seven draw inspections. Defendant Patrick Carr is the Chief Operating Officer of HMS.

## I

## PATRICK CARR CANNOT BE HELD PERSONALLY LIABLE FOR THE ALLEGED NEGLIGENCE, FRAUDULENT MISREPRESENTATIONS, AND BREACH OF GOOD FAITH AND FAIR DEALING BY HMS

As an initial matter, the court notes that Patrick Carr is not personally liable for the alleged wrongs committed by HMS. It would be inappropriate to pierce the corporate veil and hold Carr personally liable for the acts of HMS: there is no evidence of unity of ownership and interest and there is no evidence that Carr used the corporate form to perpetrate a fraud. Brown's complaint alleges no evidence that would warrant piercing the veil and at the hearing on Carr's motion, Brown agreed that it was not appropriate to hold Carr personally liable. The court will therefore grant Carr's motion for summary judgment as to all claims against him in his personal capacity. Moreover, even if Carr had been personally involved in any of the

events giving rise to Brown's claims, he would be entitled to summary judgment for the reasons that HMS is entitled to summary judgment.

## II

## HMS IS NOT LIABLE FOR NEGLIGENCE BECAUSE IT OWED NO DUTY TO BROWN

In her amended complaint, Brown alleges that HMS failed to properly inspect Hutchinson's work before approving the draw requests. Brown alleges in her opposition to the summary judgment motion that HMS was negligent in approving the draw requests because a number of rehabilitation projects that Hutchinson should have completed before HMS approved the draw requests were not in fact completed, or were completed in a shoddy manner, at the time that the HMS inspectors signed the draws. Brown further alleges in her opposition to the motion for summary judgment at page 13 that HMS was provided with "scope of work documents,"[1] and argues that because HMS had these documents they should have recognized that the contractor was not adhering to the planned scope of the project. Although Brown also signed off on the draw requests, she alleges that by forwarding the signed draw requests to her, HMS led her to believe that the work on

her home had been performed in a workmanlike manner.

In its motion for summary judgment, HMS alleges that it is not liable to Brown in negligence as a matter of law because it was not the proximate cause of Brown's injuries, did not breach the standard of care in performing the draw inspections, and that even if it were negligent it should not be held liable because Brown was contributorily negligent in approving the draw requests.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." F.R. Civ. P. 56; *see also Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that for Brown to succeed on a claim for negligence against HMS, she must establish that it owed her a duty of care; therefore, the court need not reach HMS's arguments regarding proximate cause and contributory negligence if HMS owed her no duty of care. While the law on the 203(k) program is sparse, the handful of cases that address the 203(k) program, the regulations governing the program, and cases that address negligence claims arising under analogous HUD mortgage programs make clear that HMS did not owe a duty to Brown and therefore is not liable to her for negligence.[2]

1. Brown bases this fact on the deposition of Fred Gruher, an employee of Mortgage Edge, the original lender. Gruher also testified at pages 25–26 of his deposition that he believed that HMS was a "consultant" as to the scope of work documents, as well as the fee inspector. The court notes that Brown does not argue that HMS should be held to a higher or different standard of care (with regard to her claim of negligence) as a consultant. Indeed, Brown's pleadings and memoranda focus only on HMS's role as a fee inspector.

2. The court notes that there may be some concern regarding its raising of the duty issue

*sua sponte;* however, the parties are both clearly aware of all of the elements of negligence, as is evidenced by their briefs (even if HMS did not specifically allege that duty was lacking); moreover, the court raised some of its concerns regarding duty at the July 7, 2004, hearing and gave the plaintiff an opportunity to submit a supplemental brief addressing the court's concerns. The plaintiff had until July 28, 2004 to submit a supplemental brief addressing these issues as well as an amended copy of the deposition of Frederic Gruher, an employee of Mortgage Edge, the original lender, (because the original copy

## A. The escrow account, and other regulations, are in place to protect HUD and the lender; therefore HMS owed a duty to HUD, not to Brown.

While Brown's negligence claim presupposes that HMS owed a duty to Brown to inspect the property to ensure that her investment in the property was protected, the duty here inured to the lender and to HUD. The escrow account is established for the benefit of the lender and HUD to ensure that the rehabilitation funds are properly used. The 203(k) mortgage funds are held in escrow for the borrower, but the borrower is only entitled to the funds if the rehabilitation is completed in accordance with the terms of the 203(k) program.

An examination of the structure of the escrow transactions reveal that the predominant objective of the 203(k) draw inspection and escrow system is to reduce risk to the lender and, more importantly, to HUD. This becomes particularly clear when compared to a more typical mortgage transaction. In a typical mortgage transaction, where a borrower obtains money from a lender to purchase a home that is *not* in need of rehabilitation, the lender is protected by the value of the collateral. In a 203(k) transaction, however, the lender is severely under-collateralized because the mortgage is based on the *projected* value of the property as rehabilitated. The 203(k) program protects the lender because HUD endorses the loan; however, the government remains at risk. Therefore, the multitude of regulations with which a borrower must comply to be part of the program, including the fee inspections and Rehabilitation Escrow Account, decrease the risk to the government. The escrow account protects the lender and the government because, when inspections are properly performed, the inspections ensure that funds are released by the lender to the borrower only when there is a commensurate increase in the value of the collateral (the house).

The court's conclusion is buttressed by additional federal regulations governing the 203(k) program, the 203(k) handbook, and many of the documents signed by Brown in conjunction with her 203(k) loan. For example, the regulation governing the establishment of HUD-qualified consultants under the 203(k) program provides that HUD will create a list of certified consultants to perform tasks under the 203(k) program, but inclusion on that list does not "represent a warrant of any work performed by the consultant." 24 C.F.R. § 200.190. While this regulation is primarily intended to protect the government from liability, it also puts the home buyer on notice that she should not expect to rely on the work of the consultant for her own benefit. Moreover, it is the lender, not the home buyer, who is entitled to select a consultant to perform the draw inspections. *See* 24 C.F.R. § 203.50. That the regulations enable the lender to select the consultant, rather then leaving the selection of the consultant to the home buyer, further evince an intent to protect the lender and HUD. If the role of the fee inspector were to protect the home buyer, the regulations would likely enable the home buyer to have more of a hand in the selection of the inspector.

The 203(k) handbook (Def.'s Ex. 1) puts the home buyer on further notice that the draw inspections are not performed for her benefit. For example, paragraph 5–2.C.2 of the handbook provides that in

---

submitted as an exhibit was incomplete); the plaintiff submitted a complete copy of the Gruher deposition, however the plaintiff did

not submit a supplemental brief addressing the additional matters raised by the court.

addition to the intermediate draw inspections by which release of funds may be authorized from the Rehabilitation Escrow Account, "[t]he lender or HUD may determine that additional compliance inspections are required throughout the rehabilitation period to ensure that the work is progressing in a satisfactory manner." Although the release of funds may not be authorized through such a supplemental inspection, such inspections ensure that the collateral is protected and, more specifically, protect the investment of HUD and the lender, again demonstrating that the inspection process is generally in place for the benefit of HUD and the lender and does not create a duty to the home buyer.

Paragraph 1–20 of the handbook also outlines the "Lender's Quality Control Plan" and stresses that the lender must carefully monitor the escrow account. The lender is required to track and record all escrow account transactions through an accounting system approved by HUD. These regulations make clear HUD's intent to require the lender to take all necessary actions to maintain the integrity of the escrow account so that HUD's investment is protected. This again indicates that the system is in place to protect HUD, not to ensure that construction is progressing smoothly so that the buyer's investment is protected. Any alignment of the buyer's interest with HUD's is merely incidental.

■ The above regulations and handbook provisions cited by the court clearly indicate that the fee inspector is in place to protect HUD's investment. As was noted by the court previously, a 203(k) mortgage is a risky investment for lenders because the loan is under-collateralized. HUD steps in and absorbs much of that risk by insuring the loan; however, as a result, HUD is left on financially shaky ground. The fee inspectors clearly owe HUD a duty to ensure that funds are only released from the Rehabilitation Escrow Account as commensurate improvements are made on the property. However, the fee inspectors owe no duty to the home buyer.

Brown should have been on notice that HMS and its fee inspectors owed her no duty because many of the papers signed by Brown in connection with her 203(k) loan demonstrated this fact. Brown signed a borrower's acknowledgment (Pl.'s Ex. 15) in which she agreed that if she found that the rehabilitation work on her property had been completed in a workmanlike manner, she would sign a draw request, "thereby accepting responsibility that the completed work is acceptable and payment is justified." If she disagreed with the contractor that the work was completed in a workmanlike manner, she could refuse to sign the draw request and she could ask the fee inspector for a determination of whether the work was properly completed. The acknowledgment, however, made clear that the ultimate responsibility for ensuring that the contractor properly completed the work rested with Brown and if after the fee inspector's review Brown and the contractor still could not reach an agreement on the completion of the work, the terms of the acknowledgment enabled the lender to hold the funds until an arbitrator reached a decision as to the quality of the work product. This again indicated that although Brown could request the fee inspector's opinion, she was not forced to rely on it, and could still take the matter to an arbitrator for a final determination.

■ Brown signed draw requests certifying that the work on her property was completed in a workmanlike manner, although she alleges that she relied upon HMS's representations in signing the draw requests. However, the court believes it is clear from the borrower's agreement ref-

erenced above that Brown herself was ultimately responsible for certifying that the work was completed in a workmanlike manner. Indeed in signing the draw requests herself, Brown was required to certify that: "This draw request is submitted for payment. All completed work has been done in a workmanlike manner. I hereby certify to the actual costs of rehabilitation as shown above in column 3." (*See, e.g.,* Pl.'s Ex. 3). While it is true that only the fee inspector had to certify to performing a physical inspection of the property, both Ms. Brown and the fee inspector had to certify that the work was completed in a workmanlike manner. The fact that each party was independently required to certify to that fact on a draw request to be provided to the lender and HUD indicates a duty inuring to the lender and HUD, not to Brown.[3]

Ultimately, the court believes that the 203(k) regulations, handbooks, documents signed by Brown, and indeed the very structure of the program indicate that no duty was owed by HMS to Brown. Rather HMS owed a duty to HUD.

**B. Case law construing HUD lending programs further supports the court's conclusions.**

There are few cases addressing conflicts that arise under the 203(k) program; however at least one case indicates that the 203(k) program establishes only a duty between the fee inspector and HUD and the lender. *See United States v. Coyle,* No. 02–3593, 2004 U.S.App. LEXIS 2274 (6th Cir.2004) (noting that the inspector, who must ensure that the contractor has adequately completed rehabilitation work before signing a draw request, is a fiduciary of HUD and the lender).[4] *Coyle* was a criminal case in which the government appealed the sentences received by two defendants convicted of committing fraud against HUD under the 203(k) program. In *Coyle,* the defendant Coyle, a fee inspector, was convicted of making false statements after falsely certifying that repairs had been performed on a property that was to be rehabilitated under the 203(k) program.

Although *Coyle* involved criminal fraud and the case at bar involves negligence, this court finds *Coyle* informative as to the purpose of the 203(k) program and the duties created by the draw inspections. The *Coyle* court mentions the role of the fee inspector as a fiduciary of HUD; additionally, the very fact the government prosecuted and convicted the fee inspector seems to indicate that a special duty to HUD is created by the parties' relationship through the 203(k) program. This court therefore finds *Coyle* persuasive in holding that the fee inspections performed by HMS were performed for the benefit of HUD, not Brown, and that HMS did not owe a duty to Brown.

In *Banks v. Consumer Home Mortgage, Inc.,* No. 01–CV8508, 2003 WL 21251584, 2003 U.S. Dist LEXIS 8230 (E.D.N.Y. 2003), the district court reached a somewhat contrary holding and permitted plaintiffs to overcome a motion to dismiss and to assert a fraud claim against several defendants who defrauded the plaintiffs in

---

**3.** Much of the evidence submitted in this case indicates that the work was not completed in a workmanlike manner; HMS may or may not be liable to HUD or the lender for negligent inspections. But, even if HMS was negligent in performing its inspections, Brown cannot recover from HMS where HMS owed no duty of care to Brown.

**4.** The court recognizes that this case is unpublished and citation *within* the Sixth Circuit is limited by Sixth Circuit Rule 28(g); nonetheless, the court finds citation to this case useful because there is so little case law construing the 203(k) program.

a 203(k) lending scheme. The court finds *Banks* distinguishable, however, because of the particularly egregious facts of that case. Moreover, the court notes that the elements of fraud and negligence differ— no duty of care is required in an action for fraud.[5] The facts of *Banks* are complex and there were a number of defendants involved; the court will recount only the salient facts here.

In that case, the plaintiffs sought to purchase property and met with the salesperson of a real estate brokerage firm. That salesperson appealed to the plaintiffs as "a fellow African–American ... helping them fulfill the American dream of home ownership by finding the right house at the right price." *Id.*, 2003 WL 21251584 at *1, 2003 U.S. Dist LEXIS 8230 at *4. The firm allegedly provided a sales quote to the plaintiffs only after reviewing their financial data to determine the maximum amount that they could afford and misrepresented the value of the property that the plaintiffs were seeking to purchase. The brokerage firm arranged for appraisals and inspections and represented to the plaintiffs that the evaluations "were particularly reliable and honest as they were preformed on behalf of HUD." *Id.*, 2003 WL 21251584 at *2, 2003 U.S. Dist LEXIS 8230 at *7. The defendants also affirmatively informed the plaintiffs that they did not need to hire their own inspectors or appraisers because the defendants would be able to handle those tasks at a lower cost. *Id.* The defendants then proceeded to deceive the plaintiffs as to the value of the property—both current value and value after the projected repairs. The defendants proceeded to engage in a number of other fraudulent transactions related to the closing on the property.

*Banks* is distinguishable for two reasons. First, it is clear from the facts of *Banks* that there was an intent on the part of the defendants to fraudulently induce the plaintiffs to enter into a transaction with the purpose of defrauding HUD. Second, and more importantly for the purpose of distinguishing this negligence action, the defendants told the plaintiffs that they would perform their inspections reliably and told the plaintiffs that there was no need for them to hire their own inspectors; the defendants thus indicated that they were representing the interests of the plaintiffs. Therefore, although *Banks* is not a negligence case and does not address the issue of whether an inspector owes a duty to the home owner, in that case, where an inspector holds himself out to plaintiffs as performing an inspection on their behalf, a duty may arise separately.

But here, Brown does not allege that a duty was created out of any relationship with HMS other than the home buyer—fee inspector relationship typical in these types of HUD programs. Brown stated in her deposition that she inferred that Mr. Thur, the original fee inspector, had a relationship with her because she hired him and had a contract with him; however such an inference was not warranted in the case of HMS. HMS was hired by the lender and made no representations to Brown, other than the signed draw requests, regarding the quality of the construction on her property. The only other contact Brown had with HMS occurred at the final inspection where the inspector responded affirmatively to Brown's inquiry as to whether the amount authorized by the final draw request should cover the completed work.[6] These minor communications

5. The court recognizes that Brown has alleged that HMS should be liable to her for fraud; the court will address Brown's fraud complaint in part IV, *infra.*

6. The court notes there is some conflict as to

simply do not create a special duty to Brown.

As the court indicated previously, there are few 203(k) cases; however, the court also finds support for its conclusions in cases interpreting other HUD lending programs. For example, the 203(k) program is analogous to HUD lending programs in which HUD-approved inspectors provide appraisals of property purchased with FHA-insured loans.

In *Clark v. Grover*, 132 Mich.App. 476, 347 N.W.2d 748 (1984), the plaintiffs sought to recover damages against a HUD-approved lender for death and personal injuries caused by carbon monoxide poisoning in a home purchased through an FHA-insured loan. The lender in that case employed a contractor to inspect property to be purchased by the plaintiffs to ensure that the property qualified for an FHA-insured mortgage. The plaintiffs argued that the act of hiring the inspector created a duty to the plaintiffs, which was breached when the inspector failed to discover the danger of the potential of carbon monoxide poisoning occurring on the property. The court disagreed, however, and held that the lender owed no duty to the plaintiffs. *Id.* at 750. Rather, the court found that the inspection required by the statute and regulations was required to ensure "(1) the availability of mortgages on terms more favorable to the mortgagor than the market would otherwise provide, and (2) the security of the government's insurance funds." *Id.* at 750.

Although *Clark* is in some ways distinguishable from the case at bar (the inspec-

tion involved in *Clark* was an initial appraisal and the lender was being sued, not the inspector), the court finds the reasoning of *Clark* persuasive. In *Clark*, the plaintiff was attempting to hold the defendant liable for failure to discover a safety violation, and the court reasoned there that safety violations were, in the context of the HUD regulations, a concern only to the extent that they impacted the availability of mortgages on favorable terms and impacted the government's investments. *Id.* Similarly, the periodic fee inspections here merely tracked the progress of construction on Brown's property not to protect her home, but to protect the government's investment. Any benefit she received might have received if her interests and the government's were aligned were merely incidental. The primary benefit Brown received was a more readily available, low-interest rate, single-transaction mortgage, for both the purchase and rehabilitation of her home. In the words of the *Clark* court, the escrow and fee inspection system ensures "(1) the availability of mortgages on terms more favorable to the mortgagor than the market would otherwise provide, and (2) the security of the government's insurance funds." *Id.*

Other analogous cases have addressed the issue of duty in a mortgage appraisal context. *See United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) (holding that the FHA does not owe a duty to a purchaser to accurately appraise property so as to warrant purchase

---

whether there was another conversation between Brown and the fee inspector, Lyles. The defendant filed the affidavit (ex. 6) of Paul Lyles, the fee inspector, in which Lyles averred that he had a telephone conversation with Brown in which he informed her that her house was not ready for the final inspection. In Brown's deposition, however, she

stated that her only conversation with an HMS inspector was during the final fee inspection (Pl.'s Ex. 1 at 125) and that she had no contact with Lyles. In either case, it does not appear that any fee inspector held himself out as representing Brown in any special capacity.

value, under a statute requiring a seller to disclose FHA-appraised value); *see also Jackson v. Romney*, 355 F.Supp. 737 (D.D.C.1973) (holding that, in insuring mortgages under 12 U.S.C. § 221(d)(2), the FHA does not have a duty to homeowners to insure only mortgages that conform to local building codes); *Hines v. United States Att'y Gen.*, CIV.A. No. 88–658–N, 1989 WL 223524 (E.D.Va.1989) (noting that a HUD inspector is required to inspect property before HUD will insure a mortgage to protect the government and further noting that "HUD's inspection created no warranties and no duty to the plaintiff [home owner]").

Although the above cases are distinguishable because they did not involve 203(k) rehabilitation inspections and were cases in which the plaintiffs brought suit directly against the government (as opposed to a private, HUD-approved consultant), the court finds these cases persuasive. Much of the Supreme Court's analysis in *Neustadt* rested on whether the plaintiffs' claim was actionable under the Federal Tort Claims Act, and the Court noted that the "predominant objective of the appraisal system was the 'protection of the Government and its insurance funds.'" *Neustadt*, 366 U.S. at 709, 81 S.Ct. 1294 (citations omitted). The district court in *Maiden* further noted that the benefit to be received by the home buyer was not the appraisal but was the "that a soundly functioning FHA mortgage guarantee program will make mortgage money more readily available for low and middle income home purchasers." *U.S. v. Maiden*, 355 F.Supp. 743 (D.Conn.1973). In employing this persuasive reasoning the courts found that the government owed no duty to a private home owner.

The reasoning of the above cases is equally persuasive to the facts at bar even though Brown received her loan through the 203(k) program and seeks to sue a private party, as opposed to the government agency. The predominant objective of the 203(k) appraisal system is to serve as a means of protecting the government's investment. Moreover, the predominant benefit received by Brown is that mortgage money was made available to her in a low-interest rate, single transaction, loan. Most importantly, in examining the predominant objective of the 203(k) appraisal system and the benefits to be received by Brown under the system it is clear that the fee inspection system was in place for the benefit of HUD, as were the appraisal systems discussed in *Maiden* and *Neustadt*. The courts in those cases found that the government did not owe a duty to the private borrower. That reasoning extends to the facts of this case. The fee inspectors owed no duty to Brown but were in place to protect the government's investment.

### C. Conclusion

For all of the foregoing reasons, HMS owed no duty of care to Brown, and the court will therefore grant summary judgment to HMS on Brown's claim of negligence.

### III

### HMS IS NOT LIABLE TO BROWN FOR NEGLIGENT MISREP- RESENTATION

 In her amended complaint, at paragraph 98, Brown alleges that HMS is liable to Brown for negligent misrepresentation. To establish a claim for negligent misrepresentation, Brown must prove that HMS made (1) a false statement or omission of a fact which it had a duty to disclose; (2) that the false statement or omission of fact involved a material issue; and (3) that Brown relied upon that state-

ment or omission to her detriment. *See Appleton v. United States*, No. CIV.A. 98–0344, 2001 WL 45473, at *3 (D.D.C. Jan. 5, 2001) (citations omitted). The court will grant summary judgment in favor of HMS because it is clear that, as a matter of law, HMS neither made false statements nor omissions of material fact which it had a duty to disclose to Brown.

Brown's claim for negligent misrepresentation is easily disposed of in light of the court's reasoning in section II, *supra*, regarding Brown's negligence claim. Where HMS owed no duty of care to Brown, thus preventing Brown from establishing a claim for negligence, she is similarly unable to establish a claim for negligent misrepresentation. As the court in *Clark v. Grover* noted, "the existence of a duty of care [is] a prerequisite" for stating a cause of action for negligent misrepresentation. 132 Mich.App. 476, 347 N.W.2d 748, 751 (1984) (citations omitted). Therefore, in light of the court's prior determination that HMS owed no duty of care to Brown, the court finds that HMS is entitled to judgment as a matter of law on the claim of negligent misrepresentation.

## IV

## HMS IS NOT LIABLE TO BROWN FOR FRAUDULENT MISREPRESENTATION

█ In her complaint Brown also alleges that HMS is liable to her for fraudulent misrepresentation. For Brown to establish that HMS is liable for fraudulent misrepresentation, she must show that (1) HMS made a false representation; (2) the false representation was with regard to a material fact; (3) HMS had knowledge of its falsity; (4) HMS intended to deceive Brown; (5) Brown acted in reliance on the representation; and (6) the reliance was in fact reasonable. *See In re U.S. Office Prod. Co. Secs. Litig.*, 251 F.Supp.2d 77,

99–100 (D.D.C.2003). Under District of Columbia law, reliance is only required to be reasonable in transactions involving commercial contracts. *See id.* at 100 n. 13.

█ The crux of the court's analysis of Brown's claim for negligence and negligent misrepresentation rested on the court's conclusion that, as a matter of law, HMS owed no legal duty of care to Brown. However, Brown need not establish that HMS owed her a duty in order to succeed on a claim of fraudulent misrepresentation. Indeed, it is well established that a plaintiff need not establish the existence of privity of contract or any specific duty of care to recover on a claim for fraud. *See, e.g. Miller v. Bargain City, U.S.A., Inc.*, 229 F.Supp. 33, 39–40 (E.D.Pa.1964). Nonetheless, the court finds, examining the facts in a light most favorable to Brown, that as a matter of law Brown's claim for fraudulent misrepresentation must fail. For the following reasons the court will grant HMS's motion for summary judgment as to Brown's claim for fraudulent misrepresentation.

Brown alleges that the HMS inspectors represented on draw requests that brick walls and siding had been completed, although her expert suggested that both of those items should be demolished or replaced. Brown also alleges that HMS inspectors misrepresented the level of completion of the roof, door, and window work on her property, as well as a number of decorative, plumbing, heating, and electrical problems. Brown also clearly alleges that she relied upon the representations made by the HMS inspectors in signing off on the draw requests herself. However, Brown's memorandum in support of her opposition to HMS's motion for summary judgment simply states that the inspector for HMS "failed miserably to do what HMS is supposed to do and to do what he

certified to the borrower and lender that he had done relative to the workmanlike quality of the contractor's work." (Pl.'s Mem. Opp. Summ. J. at 15).

Where Brown's claim must fail is the "intent to deceive" prong. Nowhere does Brown allege that HMS intended to deceive her regarding the rehabilitation of her property. Although her count XII, paragraph 102 of Brown's amended complaint alleges that HMS intended to induce Brown to "expend funds established under her mortgage in a manner which would result in a benefit to [HMS]," this bald assertion is unsupported by any facts or evidence. At most, Brown alleges that HMS was simply not doing their job well. Viewing all of the facts, as the court must, in a light most favorable to Brown, the court must agree that (1) HMS made false representations; (2) with regard to material facts; and (3) that Brown relied on those false representations. Brown has simply alleged that HMS was not doing their job well and the court cannot read a fraudulent motive into HMS's actions where Brown has failed to allege one.[7] Reviewing all of the facts, the court finds, at worst, in Brown's words, HMS was simply "ratifying" what the contractor and lender represented to HMS the status of the work to be. (Pl.'s Mem. Opp. Summ. J. at 15). This is insufficient to satisfy the basic elements of a claim for fraudulent misrepresentation.

For the foregoing reasons, the court will grant HMS's motion for summary judgment as to Brown's fraudulent misrepresentation claim.

## V

## HMS IS NOT LIABLE TO BROWN FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

Brown alleges in paragraph 94 of her amended complaint that "District of Columbia law implies into the terms of all contracts the duty to perform the agreement fairly and in good faith." She further alleges that HMS violated its duties of good faith and fair dealing to her under the contract. Although HMS has alleged in its response that it cannot be held liable for breaching the covenant of good faith and fair dealing because it had no contract with Brown, Brown alleges that she had an implied-in-fact contract with HMS. The court finds, however, even viewing the facts in a light most favorable to Brown, that no reasonable factfinder could determine that the parties had a contract. Therefore, where the parties have no contract, HMS cannot be held liable for breaching the covenant of good faith and fair dealing.

As Brown indicates in her brief, an implied-in-fact contract is an express contract differing only from other contracts "in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties...." *Fischer v. Estate of Flax*, 816 A.2d 1, 7 n. 6 (D.C.2003) (citations omitted). Thus, all elements of an express contact (including, offer, acceptance, and consideration) must be present for an implied-in-fact contract to exist. *Paul v. Howard Univ.*, 754 A.2d 297, 311 (D.C.2000). Brown alleges that HMS was hired to work on her behalf and that all of

---

**7.** The court notes that Brown's failure to thoroughly plead all of the elements of her claim for fraud also runs afoul of F.R. Civ. P. 9(b) (made applicable to this adversary proceeding through F.R. Bankr.P. 7009), which requires fraud to be pled with particularity. However, because this matter is before the court on the defendant's motion for summary judgment the court has gone beyond the pleadings to determine the adequacy of the plaintiff's claim.

the terms of a contract were present. However, none of the facts alleged by Brown establish the existence of a contract. Nowhere in Brown's pleadings does she allege offer and acceptance. Moreover, although Brown provided the payment of the fee for HMS's inspections, as was established in part II, *supra,* HMS conducted its inspections for the benefit of HUD. Brown's payment of the fee was in consideration of the benefit of receiving a HUD-insured loan through the 203(k) loan program. HMS's contract was not with Brown or for Brown's benefit.

While the court's conclusion is based primarily upon its reasoning in part II, *supra,* the court's conclusion is buttressed by Brown's deposition. In Brown's deposition, at pages 124 through 130, she admits that she had no communication with HMS and in fact did not know that they were performing any inspections on her home until the final draw request. She indicates that she had no written communication with HMS, no contract with HMS, and merely spoke with an HMS inspector at the final draw inspection. This lack of communication or relationship with HMS cuts against Brown's assertion of the existence of a contract.

It is true that a duty of good faith and fair dealing is implied in all contracts. *Paul,* 754 A.2d at 310. However, the court finds that no reasonable fact finder could determine that a contract existed between Brown and HMS. Therefore HMS is not liable to Brown for breaching the duty of good faith and fair dealing and the court thus grants summary judgment to HMS on this count.

## VI

### CONCLUSION

For all of the foregoing reasons, the court grants the defendants Patrick Carr's and Housing Made Simple's motion for summary judgment as to all counts. The court's order follows.